# WARDAIR CANADA INC. *v.* FLORIDA DEPARTMENT OF REVENUE

No. 84–902.   Argued March 31, 1986—Decided June 18, 1986

BRENNAN, J., delivered the opinion of the Court, in which WHITE, MARSHALL, POWELL, REHNQUIST, STEVENS, and O'CONNOR, JJ., joined. BURGER, C. J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 13. BLACKMUN, J., filed a dissenting opinion, *post*, p. 18.

*Walter D. Hansen* argued the cause and filed briefs for appellant.

*Albert G. Lauber, Jr.*, argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Fried, Deputy Solicitor General Wallace, Abraham D. Sofaer,* and *Jim J. Marquez.*

*Joseph C. Mellichamp III*, Assistant Attorney General of Florida, argued the cause for appellee. With him on

the briefs were *Jim Smith,* Attorney General, *Mitchell D. Franks, William Townsend,* and *Stephen Keller.* [*]

JUSTICE BRENNAN delivered the opinion of the Court.

Appellant Wardair Canada Inc., a Canadian airline that operates charter flights to and from the United States, maintains in this action that the Commerce Clause[1] of the Constitution precludes Florida from applying to it a tax on aviation fuel purchased in that State. Wardair also asserts that the Florida tax must fall because it violates a "clear unequivocal directive of Congress," allegedly implicit in the Federal Aviation Act, 49 U. S. C. App. § 1301 *et seq.* (1982 ed. and Supp. II), that the Federal Government has exclusive regulatory power over foreign air commerce. Brief for Appellant v, 15.

We disagree with appellant's view and analysis of the operation of the Commerce Clause, and find that Congress has not acted to pre-empt state taxes such as that imposed by Florida. Accordingly, we affirm the judgment of the Supreme Court of Florida upholding the tax.

I

Florida has for many years taxed the sale of fuel to common carriers, including airlines, within the State. Prior to April 1, 1983, the tax was prorated on a mileage basis, so that a carrier was liable for only the portion of the otherwise payable tax that was equal to the ratio of its Florida mileage to its worldwide mileage for the previous fiscal year. Fla. Stat. § 212.08 (4) (1975). Effective April 1, 1983, the Florida

---

[*]*Robert D. Papkin* filed a brief for Aer Lingus et al. as *amici curiae* urging reversal.

*Benna Ruth Solomon* and *H. Bartow Farr III* filed a brief for the National Governors' Association et al. as *amici curiae* urging affirmance.

*Thomas W. Lager* and *Morton H. Silver* filed a brief for Air Jamaica Ltd. et al. as *amici curiae.*

[1]The Constitution provides that "Congress shall have Power . . . To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." Art. I, § 8, cl. 3.

4

law was amended to repeal the mileage proration formula for airlines, and the fuel tax was established at a rate of 5% on a deemed price of $1.148 per gallon. Fla. Stat. § 212.08 (4)(a)(2) (1985).[2] Under the amended law, an airline was liable for the full amount of the fuel tax whether that fuel was used to fly within or without the State, and regardless of whether the airline engaged in a substantial or a nominal amount of business within the State. The effect of this amendment was, of course, to increase substantially the tax liability of airlines, such as foreign airlines, who fly largely outside of Florida, and who had, under the old scheme, paid little Florida tax on fuel.

Shortly after the new law was enacted, appellant filed suit in state court attacking its validity insofar as it authorized the assessment and collection of a tax on fuel used by foreign airlines exclusively in foreign commerce. Wardair argued, among other things, that the law was unconstitutional under the Commerce Clause and that it was inconsistent with the Nonscheduled Air Services Agreement, May 8, 1974, United States-Canada, Art. XII, 25 U. S. T. 787, T. I. A. S. No. 7826 (U. S.-Canadian Agreement or Agreement), a bilateral agreement between the Governments of Canada and the United States regulating air charter service between the two countries. Wardair's case was consolidated for trial with a similar suit brought by a number of other foreign airlines.

In a separate order addressing only Wardair's claims, the trial court rejected the Commerce Clause arguments but found that the U. S.-Canadian Agreement expressed a "federal policy" to exempt foreign airlines from fuel taxes. The court further found that this "policy" precluded the individual States from acting in this area and thus preventing the

---

[2] Florida has since substantially amended its statute which imposes taxes on aviation fuel. Those amendments, which became effective July 1, 1985, do not in any way bear on the present controversy, which concerns only appellant's tax liability from April 1, 1983, to July 1, 1985.

United States from "speaking with one voice" with respect
to foreign commerce. In reaching this conclusion, the court
relied largely on our decision in *Japan Line, Ltd.* v. *County
of Los Angeles*, 441 U. S. 434 (1979). The court granted
appellant a permanent injunction against the Florida Depart-
ment of Revenue from assessing and collecting the fuel tax
from Wardair.

The case was certified to the Supreme Court of Florida,
which reversed, in part, the trial court. 455 So. 2d 326
(1984). The Supreme Court first noted that the U. S.-
Canadian Agreement by its terms exempted carriers only
from national, as opposed to state or local (or, in the case of
Canada, provincial) excise taxes, inspection fees, and other
charges, and thus held that the Agreement did not pre-empt
state sales taxes. Nor was the court persuaded that the
Florida tax was invalid under the Foreign Commerce Clause.
The court again referred to the fact that the Agreement ex-
empted only national taxes, and "presume[d] this has been
done intentionally." *Id.*, at 329. Having determined that
the Federal Government had, in effect, itself elected not to
prohibit the States from taxing aviation fuel, the court re-
jected the contention that the state tax "prevents our federal
government from speaking with one voice," *ibid.*, and thus
distinguished *Japan Line.* We noted probable jurisdiction,
474 U. S. 943 (1984), and now affirm.

## II

Wardair suggests that by enacting the Federal Aviation
Act (Act), Congress "left no room for local government par-
ticipation" with respect to foreign air travel. Brief for Ap-
pellant 39. Appellant does not expressly label this a pre-
emption argument; rather, it relies on metaphor and tells us
that "in the field of foreign air commerce it is the Federal
Government that calls the tune. It is the Federal Govern-
ment that is the conductor of the music, deciding how it
is to be played and who are the players." *Id.*, at 44. We

6

assume that appellant intends, by this metaphor, to persuade us that Congress has determined to "occupy the field" of international aviation, and thus to pre-empt all state regulation. The argument is without merit.

It is of course true, as appellant notes, that Congress has, through the Act, regulated aviation extensively. The agencies charged by Congress with regulatory responsibility over foreign air travel exercise power, as appellant observes, over licensing, route services, rates and fares, tariffs, safety, and other aspects of air travel. However, state law is not preempted whenever there is any federal regulation of an activity or industry or area of law. The Supremacy Clause, among other things, confirms that when Congress legislates within the scope of its constitutionally granted powers, that legislation may displace state law, and this Court has throughout the years employed various verbal formulations in identifying numerous varieties of pre-emption. See, *e. g.*, *Louisiana Public Service Comm'n* v. *FCC*, 476 U. S. 355, 368–369 (1986). But we have consistently emphasized that the first and fundamental inquiry in any pre-emption analysis is whether Congress intended to displace state law, and where a congressional statute does not expressly declare that state law is to be pre-empted, and where there is no actual conflict between what federal law and state law prescribe, we have required that there be evidence of a congressional intent to pre-empt the specific field covered by the state law. *Pacific Gas & Electric Co.* v. *State Energy Resources Conservation and Development Comm'n*, 461 U. S. 190 (1983); *Silkwood* v. *Kerr-McGee Corp.*, 464 U. S. 238 (1984). In the present case, not only is there no indication that Congress wished to preclude state sales taxation of airline fuel, but, to the contrary, the Act expressly permits States to impose such taxes. Section 1113 of the Act, as added, 87 Stat. 90, and as amended, 49 U. S. C. App. § 1513, addresses the issue of "State taxation of air commerce," detailing in § 1113(a) the kinds of taxes which are prohibited and in § 1113(b) those

which are permissible. Among the permissible taxes are "sales or use taxes on the sale of goods or services." It is, of course, plausible that Congress never considered whether States should be permitted to impose sales taxes on foreign, as opposed to domestic, carriers, and therefore we do not rely on the existence of this section to answer the Commerce Clause issue raised here by appellant and considered by us *infra*. However, this section of the Act does provide the complete response to appellant's pre-emption argument. For what § 1113(b) shows is that, to the degree that Congress considered the power of the States to tax air travel, it expressly and unequivocally permitted the States to exercise that authority. In other words, rather than prohibit state regulation in the area, Congress invited it. This is not the stuff of pre-emption.

### III

In cases involving the so-called dormant Commerce Clause, both interstate and foreign, the Federal Government has not affirmatively acted, and it is the responsibility of the judiciary to determine whether action taken by state or local authorities unduly threatens the values the Commerce Clause was intended to serve. See *Southern Pacific Co.* v. *Arizona*, 325 U. S. 761 (1945). As we have previously observed: "The few simple words of the Commerce Clause . . . reflected a central concern of the Framers that was an immediate reason for calling the Constitutional Convention: the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation." *Hughes* v. *Oklahoma*, 441 U. S. 322, 325–326 (1979). In recognition of the importance of this conviction, we have acknowledged the self-executing nature of the Commerce Clause and held on countless occasions that, even in the absence of specific action taken by the Federal Government to disapprove of state regulation implicating interstate or foreign commerce, state

regulation that is contrary to the constitutional principle of ensuring that the conduct of individual States does not work to the detriment of the Nation as a whole, and thus ultimately to all of the States, may be invalid under the unexercised Commerce Clause. See *H. P. Hood & Sons, Inc.* v. *DuMond,* 336 U. S. 525 (1949); *Southern Pacific Co.* v. *Arizona, supra.* In the unique context of foreign commerce, we have alluded to the special need for federal uniformity: "'In international relations and with respect to foreign intercourse and trade the people of the United States act through a single government with unified and adequate national power.' *Board of Trustees* v. *United States,* 289 U. S. 48, 59 (1933),'" *Japan Line,* 441 U. S., at 448. As in the context of cases alleging violations of the dormant Interstate Commerce Clause, the concern in these Foreign Commerce Clause cases is not with an actual conflict between state and federal law, but rather with the policy of uniformity, embodied in the Commerce Clause, which presumptively prevails when the Federal Government has remained silent.

When a state tax is challenged as violative of the dormant Interstate Commerce Clause, we have asked four questions: is the tax applied to an activity with a substantial nexus with the taxing State; is the tax fairly apportioned; does the tax discriminate against interstate commerce; and is the tax fairly related to the services provided by the State. *Complete Auto Transit, Inc.* v. *Brady,* 430 U. S. 274, 279 (1977). In *Japan Line, supra,* we noted that when the state tax allegedly interferes with the Federal Government's authority to regulate foreign commerce, two additional questions must be asked: "first, whether the tax, notwithstanding apportionment, creates a substantial risk of international multiple taxation, and, second, whether the tax prevents the Federal Government from speaking with one voice when regulating commercial relations with foreign governments." *Id.,* at 451.

In the present case, appellant concedes that Florida's tax satisfies the four-part test set out in *Complete Auto.* In

other words, it is not disputed that if this case did not involve foreign commerce, the Florida tax on the sale of aviation fuel would not contravene the Commerce Clause. Appellant also recognizes that there is no threat of multiple international taxation in this case, since the tax is imposed only upon the sale of fuel, a discrete transaction which occurs within one national jurisdiction only. Appellant and the United States as *amicus curiae* thus rely entirely on the final factor identified in *Japan Line*, and argue that the Florida tax violates the Foreign Commerce Clause because it threatens the ability of the Federal Government to "speak with one voice." Specifically, they urge that there exists a federal policy of reciprocal tax exemptions for aircraft, equipment, and supplies, including aviation fuel, that constitute the instrumentalities of international air traffic, and that this "policy" represents the statement that the "one voice" of the Federal Government wishes to make and which is threatened by the state law. We disagree. In our view, the evidence relied upon by appellant and the United States not only fails to reveal any such federal policy, but, even more fundamentally, shows also that in the context of this case we do not confront federal governmental silence of the sort that triggers dormant Commerce Clause analysis. On the contrary, the international agreements cited demonstrate that the Federal Government has affirmatively acted, rather than remained silent, with respect to the power of the States to tax aviation fuel, and thus that the case does not call for dormant Commerce Clause analysis at all. Moreover, in our view the actions taken by the Federal Government accept the authority of States to tax as Florida has here, and lend further support to the position and views advanced by appellee and relied on by the Florida Supreme Court in rejecting Wardair's arguments.

Appellant and the United States maintain that the policy of tax exemption for the instrumentalities of international air traffic is manifested by, among other things, (1) the Chicago Convention on International Civil Aviation, opened for signa-

ture, Dec. 7, 1944, 61 Stat. 1180 (Chicago Convention), an international convention to which the United States and 156 other nations, including Canada, are parties; (2) a Resolution (Resolution) adopted November 14, 1966, by the International Civil Aviation Organization (ICAO), an organization of which the United States is a member by virtue of being a party to the Chicago Convention; (3) more than 70 bilateral agreements, including the U. S.-Canadian Agreement, into which the United States has entered with various foreign countries dealing with international aviation. But what these documents show is that while there appears to be an international *aspiration* on the one hand to eliminate all impediments to foreign air travel—including taxation of fuel— the *law* as it presently stands acquiesces in taxation of the sale of that fuel by political subdivisions of countries. Thus, Article 24(a) of the Chicago Convention by its terms precludes the imposition of local taxes on fuel only when the fuel is "on board an aircraft . . . on arrival . . . and retained on board on leaving" a contracting party; it does not prohibit taxation of fuel purchased in that country. 61 Stat. 1186. We agree with *amici* National Governors' Association et al. that the negative implications of this provision support recognizing Florida's power to tax; certainly, the provision demonstrates the international community's awareness of the problem of state and local taxation of international air travel, specifically aviation fuel, and represents a decision by the parties to that Convention to address the problem by curtailing and limiting only some of the localities' power to tax, while implicitly preserving other aspects of that authority.

Nor does the Resolution provide support for appellant's contention that there is a clear national policy of exempting aviation fuel from state sales taxes. While the Resolution undeniably does endorse an international scheme whereby fuel would be exempt "'from all customs and other duties,'" which it defines as including "'import, export, excise, sales, consumption and internal duties and taxes of all kinds levied

. . . by any taxing authority within a State,'" Brief for United States as *Amicus Curiae* 12 (Sept. 17, 1985), quoting Resolution pp. 3, 4 (emphasis deleted), the Resolution is formally merely the work product of an international organization of which the United States is a member; it has not been specifically endorsed, let alone signed, entered into, agreed upon, approved, or passed by either the Executive or Legislative Branch of the Federal Government. In other words, no action has been taken to give the Resolution the force of law. While it is not argued by either appellant or by the United States as *amicus* that this Resolution in and of itself should operate to pre-empt state law, we also think it untenable to assert, as they do, that this Resolution represents a policy *of the United States*, as opposed to a policy of an organization of which the United States is one of many members.

Our reluctance in this regard is bolstered by the fact that the United States has, since the time that the Convention came into force, become a party to more than 70 bilateral aviation agreements, and in not one of these agreements has the United States agreed to deny the States the power asserted by Florida in this case. Most of these agreements explicitly commit the United States to refrain from imposing *national* taxes on aviation fuel used by airlines of the other contracting party, see Brief for United States as *Amicus Curiae* 14–17, 19, but as the United States concedes, "none of our bilateral aviation agreements explicitly interdicts state or local taxes on aviation fuel used by foreign airlines in international traffic." *Id.*, at 17. Most strikingly as it relates to the case before us, the U. S.-Canadian Agreement itself limits the tax exemption to be afforded to foreign air carriers to "national duties and charges." App. A–58. Taxation by political subdivisions of either the United States or Canada are not mentioned, an omission which must be understood as representing a policy choice by the contracting parties, especially in light of the fact that the Resolution addressed this concern eight years before the United States and Canada en-

tered into the Agreement. We note that throughout the time that the U. S.-Canadian Agreement has been in force, some American States, as well as some Canadian Provinces, have imposed taxes within their jurisdictions on aviation fuel used by Canadian and American carriers respectively in international travel. Furthermore, there was not, until recently, any challenge to the localities' legal authority to do so. Although not dispositive, this course of conduct suggests that the parties to the Agreement and those most immediately affected by it understood it to permit this sort of taxation.

What all of this makes abundantly clear is that the Federal Government has not remained silent with regard to the question whether States should have the power to impose taxes on aviation fuel used by foreign carriers in international travel. By negative implication arising out of more than 70 agreements entered into since the Chicago Convention, the United States has at least acquiesced in state taxation of fuel used by foreign carriers in international travel. Again, in the U. S.-Canadian Agreement only "national" charges are barred, and we presume that drafters from two federalist nations understood this as representing a choice not to preclude local taxation. It would turn dormant Commerce Clause analysis entirely upside down to apply it where the Federal Government has acted, and to apply it in such a way as to *reverse* the policy that the Federal Government has elected to follow. For the dormant Commerce Clause, in both its interstate and foreign incarnations, only operates where the Federal Government has not spoken to ensure that the essential attributes of nationhood will not be jeopardized by States acting as independent economic actors. However, the Federal Government is entitled in its wisdom to act to permit the States varying degrees of regulatory authority. In our view, the facts presented by this case show that the Federal Government has affirmatively decided to permit the States to impose these sales taxes on aviation fuel. Accord-

ingly, there is no need for us to consider, and nothing in this opinion should be understood to address, whether, in the absence of these international agreements, the Foreign Commerce Clause would invalidate Florida's tax.

In *Japan Line*, 441 U. S., at 451, we explained that Foreign Commerce Clause analysis requires that a court ask whether a state tax "prevents the Federal Government from 'speaking with one voice when regulating commercial relations with foreign governments.'" But we never suggested in that case or any other that the Foreign Commerce Clause *insists* that the Federal Government speak with any particular voice.

In light of the above, the judgment of the Supreme Court of Florida is

*Affirmed.*

CHIEF JUSTICE BURGER, concurring in part and concurring in the judgment.

The Court acknowledges in its discussion in Part II concerning the scope of the Federal Aviation Act that "not only is there no indication that Congress wished to preclude state sales taxation of airline fuel, but, to the contrary, the Act expressly permits States to impose such taxes." *Ante*, at 6. That being so I see no reason for the discussion in Part III.

While 49 U. S. C. App. § 1513(a) describes a number of state taxes which are prohibited, § 1513(b) expressly permits state "sales or use taxes on the sale of goods or services." The fuel tax challenged here is plainly a "sales or use ta[x] on the sale of goods" within the language of § 1513(b).

Remarkably, the Court nevertheless refuses to "rely on the existence of this section to answer the Commerce Clause issue raised here" because it believes it is "plausible that Congress never considered whether States should be permitted to impose sales taxes on *foreign*, as opposed to domestic, carriers." *Ante*, at 7 (emphasis added). Accordingly, the Court continues with an extended discussion of "the so-called dormant Commerce Clause," which applies to cases involving

areas where "the Federal Government has not affirmatively acted." *Ibid.* The plain language of § 1513(b) demonstrates, however, that there is *nothing* "dormant" here.

The conclusion the Court reaches in Part II is illuminated by the Court's curious failure to even mention any of the extensive legislative history or this Court's recent precedent concerning the enactment of § 1513, which followed our decision in *Evansville-Vanderburgh Airport Authority Dist. v. Delta Airlines, Inc.*, 405 U. S. 707 (1972). In that case the Court upheld a $1-per-passenger "head tax" on all passengers boarding airplanes at the Evansville airport, after rejecting a Commerce Clause attack because the tax did not discriminate between interstate and intrastate commerce.

Congress reacted immediately to our decision by holding hearings on local taxation of air transportation. See Hearings on S. 2397 et al. before the Subcommittee on Aviation of the Senate Committee on Commerce, 92d Cong., 2d Sess., 129–198 (1972) (hereafter Senate Hearings); Hearings on H. R. 2337 et al. before the Subcommittee on Transportation and Aeronautics of the House Committee on Interstate and Foreign Commerce, 92d Cong., 2d Sess. (1972) (hereafter House Hearings). The result of these hearings was the enactment of § 7(a) of the Airport Development Acceleration Act of 1973, see Pub. L. 93–44, § 7(a), 87 Stat. 90, which added § 1113 to the Federal Aviation Act, and which is now codified, as amended, at 49 U. S. C. App. § 1513.

We subsequently addressed the scope of § 1513(a)'s prohibition when confronted with Hawaii's state tax on the gross income of airlines operating within that State. See *Aloha Airlines, Inc. v. Director of Taxation*, 464 U. S. 7 (1983). Reviewing the legislative history, the Court pointed out that § 1513 was enacted out of congressional concern that "the proliferation of local taxes burdened interstate air transportation." *Id.*, at 9 (citing S. Rep. No. 93–12, pp. 17, 20–21 (1973), and H. R. Rep. No. 93–157, pp. 4–5 (1973)). We concluded unanimously that Hawaii's tax was expressly pre-

empted by the plain language of § 1513(a), 464 U. S., at 11, emphasizing that

> "when a federal statute unambiguously forbids the States to impose a particular kind of tax on an industry affecting interstate commerce, courts need not look beyond the plain language of the federal statute to determine whether a state statute that imposes such a tax is pre-empted." *Id.*, at 12 (footnote omitted).

In the course of our discussion of § 1513(a) we addressed the Hawaii Supreme Court's "professed confusion over the 'paradox' between § 1513(a)'s prohibition on certain state taxes on air transportation and § 1513(b)'s reservation of the States' primary sources of revenue, such as property taxes, net income taxes, franchise taxes, and sales or use taxes." *Id.*, at 12, n. 6. Our resolution of this "paradox" is enlightening:

> "We find no paradox between § 1513(a) and § 1513(b). Section 1513(a) pre-empts a limited number of state taxes, including gross receipts taxes imposed on the sale of air transportation or the carriage of persons traveling in air commerce. Section 1513(b) clarifies Congress' view that the States are still free to impose on airlines and air carriers 'taxes other than those enumerated in subsection (a),' such as property taxes, net income taxes, and franchise taxes. While neither the statute nor its legislative history explains exactly why Congress chose to distinguish between gross receipts taxes imposed on airlines and the taxes reserved in § 1513(b), the statute is quite clear that Congress chose to make the distinction, and the courts are obliged to honor this congressional choice." *Ibid.*

Careful review of the legislative history indicates that it is not entirely silent as to why Congress chose to make this particular distinction. The Senate's first proposal to

limit state taxation would have prohibited *any* state tax—direct or indirect—on air transportation. S. 3611, 92d Cong., 2d Sess. (1972); see also H. R. 2337, 92d Cong., 1st Sess. (1971) (similar prohibition). The States, however, complained loudly at the hearings that this sweeping provision would prohibit even unobjectionable taxes such as landing fees, fuel taxes, and sales taxes on food provided to airline passengers. *E. g.*, House Hearings, at 91 (statement of John A. Nammack, Executive Vice President, National Association of State Aviation Officials). This broad interpretation was supported by officials from the Civil Aeronautics Board and the Federal Aviation Administration, who objected to any such broad prohibition because it would deprive local governments of funds necessary for maintenance of airports. Senate Hearings, at 138 (statement of Whitney Gillilland, Vice Chairman, CAB); *id.*, at 140–141 (statement of Ronald W. Pulling, Acting Associate Administrator for Plans, FAA). In reply, Members of Congress assured these officials that the prohibition was intended to apply only to "head taxes" and the like, and that some clarification of the bill's intent would be in order. *E. g.*, *id.*, at 138, 151, 157 (statements of Sen. Cannon). See also House Hearings, at 99 (statement of Rep. Dingell); *id.*, at 101 (statement of Rep. Harvey). The final bill enacting §1513 therefore appears to be a compromise following careful consideration by Congress as to the permissible scope of state taxation in the area of air commerce.

Most relevant to the issue before us in this case is the fact that nowhere in that legislative history is there any indication that Congress intended to limit the applicability of §1513(b) to state taxation of *interstate* air commerce while prohibiting taxation of *foreign* air commerce. To the contrary, Congress was fully aware that the bill would cover foreign air commerce, since both the State Department and the Senate's own Legislative Council advised Congress that "air commerce" as employed in the proposed bill encompassed for-

eign and overseas air commerce. See Senate Hearings, at 136 (letter of David M. Abshire, Department of State); *id.*, at 207 (memorandum of Peter W. LeRoux, Senior Counsel, Office of Legislative Council). Moreover, Congress discussed the effect of foreign "head taxes" if similar local taxes were barred. House Hearings, at 35–37.

The language of the Act bears this out. Section 1513(a)'s prohibition refers to certain taxes "on persons traveling in air commerce . . . or on the sale of air transportation." The Act defines "air commerce" as including "interstate, overseas, or foreign air commerce." 49 U. S. C. App. § 1301(4). Similarly, "air transportation" is defined as including "interstate, overseas, or foreign air transportation." § 1301(10). Under the plain language of § 1513, therefore, the Florida tax—even in the area of foreign air commerce—is expressly authorized by Congress.

Just as we need not look beyond the plain language "when a federal statute unambiguously *forbids* the States to impose a particular kind of tax on an industry affecting interstate commerce," *Aloha Airlines*, 464 U. S., at 12 (emphasis added), we need not look beyond the plain language of a federal statute which unambiguously *authorizes* the States to impose a particular kind of tax. Section 1513(b) authorizes state sales taxes on goods used in air commerce. While Congress has not explained exactly why it made the distinction between taxes prohibited under § 1513(a) and those permitted under § 1513(b), "Congress chose to make the distinction, and the courts are obliged to honor this congressional choice." 464 U. S., at 12, n. 6.

By refusing to decide this case solely on the express language of § 1513(b) and instead entering the cloudy waters of this Court's "dormant Commerce Clause" doctrine, the Court fails to honor the choice already pointedly made by Congress following its extensive consideration of the problem of state taxation in this area.

JUSTICE BLACKMUN, dissenting.

In *Japan Line, Ltd.* v. *County of Los Angeles*, 441 U. S. 434 (1979), this Court recognized that the Commerce Clause commits to the exclusive authority of the Federal Government the regulation of those aspects of foreign commerce that by their very nature "necessitate a uniform national rule." *Id.*, at 449. In regulating commercial relations with foreign governments, "'the Federal Government must speak with one voice.'" *Ibid.*, quoting *Michelin Tire Corp.* v. *Wages*, 423 U. S. 276, 285 (1976). As a result, the Court in *Japan Line* held that the imposition of California's ad valorem property tax on foreign-owned containers used exclusively in foreign commerce was unconstitutional. The tax imposed in this case by Florida on fuel is indistinguishable, for Commerce Clause purposes, from the tax imposed by California on containers in *Japan Line*. Because a State's taxation on fuel used in foreign commerce will prohibit the Federal Government from speaking with "one voice," I believe that this application of Florida's tax violates the Constitution.

The Court, however, finds *Japan Line* inapposite, asserting that "we do not confront federal governmental silence of the sort that triggers dormant Commerce Clause analysis." *Ante*, at 9. To the Court, that the Federal Government has addressed some aspects of foreign aviation taxation, but has not expressly prohibited the imposition of state and local taxes, see *ante*, at 10–11, is a sufficient basis for upholding the tax at issue here. Apparently, the Court believes that once the Federal Government has spoken at all in an area, the Commerce Clause operates to permit States to act except if such action is expressly prohibited. But we have never permitted validation of state burdens on foreign commerce through this sort of implication.

For a state regulation to be removed from the reach of the dormant Commerce Clause, the intent of the Federal Government to permit state activity "must be unmistakably

clear." *South-Central Timber Development, Inc.* v. *Wunnicke*, 467 U. S. 82, 91 (1984). And the "need for a consistent and coherent foreign policy, which is the exclusive responsibility of the Federal Government," heightens the need for affirmative approval. *Id.*, at 92, n. 7. The Court's holding today is based not on the presence of this requisite "affirmative approval"; rather, the Court relies on a "negative implication arising out of more than 70 agreements" that indicate that "the United States *has at least acquiesced*" in the kind of tax imposed here (emphasis added). *Ante*, at 12. Whether or not these agreements suggest acquiescence is beside the point; what is clear is that the Federal Government has not provided the affirmative approval required to permit States to act.

The Government's efforts in the international sphere reveal an overarching and coherent policy directed at the creation of reciprocal tax exemptions in the area of foreign aviation. The Nation's aviation relations with foreign governments are implemented through a comprehensive network of treaties, bilateral executive agreements, informal arrangements, and federal statutes. Although these provisions stop short of explicitly banning state levies on aircraft fuel used in foreign travel, the indisputable pattern that emerges is one of a policy of reciprocal tax exemptions for instrumentalities of international commerce, like the containers in *Japan Line* and the fuel at issue here. The Government's inability to date to achieve full international consent to reciprocal tax exclusions neither negates nor demonstrates the absence of federal policy; it simply means that the United States has not fully succeeded, as yet, in transforming its policy into law. Indeed, the "aspiration . . . to eliminate all impediments to foreign air travel" (emphasis deleted), recognized by the Court, *ante*, at 10, is precisely the federal policy that renders the application of Florida's tax to the fuel here unconstitutional.

The decision today leaves Florida and other States free to tax foreign aviation, and will hinder the United States in

its efforts to attain reciprocal tax immunity with foreign governments. Florida's action may well undermine reciprocity agreements since other countries may react to Florida's tax with various retaliatory measures against United States carriers abroad, retaliation that "of necessity would be felt by the Nation as a whole." *Japan Line,* 441 U. S., at 453. Florida's actions may also hamper the United States' position in negotiations designed to achieve the federal policy of reciprocity because the Nation cannot speak with "one voice." In *Japan Line,* this Court made clear that a State, "by its unilateral act, cannot be permitted to place . . . impediments before this Nation's conduct of its foreign relations and its foreign trade." *Ibid.* Because the Court's decision today permits just that, I respectfully dissent.