CRESENZI BIRD IMPORTERS, INC., Novak's Tropical Aviary, Inc., and Supreme Exotic Birds, Inc., Plaintiffs,

v.

The STATE OF NEW YORK, the New York State Department of Environmental Conservation, and Henry Williams, as Commissioner of the New York State Department of Environmental Conservation, Defendants.

No. 86 Civ. 8146 (WCC).

United States District Court,
S.D. New York.

April 28, 1987.

**1442**

Lovett & Gould, White Plains, N.Y., for plaintiffs; Jane Bilus Gould, of counsel.

Robert Abrams, Atty. Gen., State of N.Y., New York City for defendants Environmental Protection Bureau; Ezra I. Bialik, Asst. Atty. Gen., of counsel.

## OPINION AND ORDER

### WILLIAM C. CONNER, District Judge.

Plaintiffs, Cresenzi Bird Importers, Inc. ("Cresenzi"), Novak's Tropical Aviary, Inc. ("Novak") and Supreme Exotic Birds, Inc. ("Supreme") (collectively, the "Importers") brought this action against defendants, the State of New York, the New York State of Department of Environmental Conservation ("DEC"), and Henry Williams, as Commissioner of DEC (collectively, the "State"), challenging the validity of New York's Wild Bird Law, New York Environmental Conservation Law § 11–1728 (1. 1984, ch. 981), and the regulations promulgated thereunder, 6 N.Y.C.R.R. § 174.1–174.10. The Importers allege that the Wild Bird Law (1) is preempted under the supremacy clause, U.S. Const. art. VI, cl. 2, by the Endangered Species Act, 16 U.S.C. §§ 1531–1543 and 50 C.F.R. Parts 17 and 23, and the federal quarantine laws, 21 U.S.C. §§ 102–105, 111, 114, and 134, and 9 C.F.R. Part 92; (2) places an unconstitutional burden on interstate commerce, U.S. Const. art. I, § 8; (3) hampers commercial speech in violation of U.S. Const. amend. I; (4) deprives Cresenzi and Novak of their property without due process of law, U.S. Const. amend. XIV and N.Y. Const. art. I, § 6, by rendering unrecoverable the funds which they expended to obtain their quarantine facilities; (5) is so vague as to deprive plaintiffs of due process of law, U.S. Const. amend. XIV and N.Y. Const. art. I, § 6; (6) delegates legislative authority to DEC, a cabinet-level agency of the State of New York, in violation of N.Y. Const. art. III, § 1; (7) has been incorrectly interpreted by DEC to exclude Cresenzi and Novak as exempt "State, Federal, or local agencies"; and (8) if interpreted to exempt Cresenzi and Novak, violates Supreme's right to equal protection of the law, U.S. Const. amend. XIV.

The State has moved to dismiss the complaint, pursuant to Fed.R.Civ.P. 12(b)(6), for failure to state a claim upon which relief can be granted, and Fed.R.Civ.P. 12(b)(1), on the ground that the Court lacks jurisdiction over the subject matter, since plaintiffs' claims are barred by the eleventh amendment, U.S. Const., and the doctrine of abstention.

## BACKGROUND

Each of the three plaintiffs is engaged in the business of importing and selling live wild birds within the State of New York. Each plaintiff is licensed by the Department of the Interior "to engage in business as an importer or exporter of wildlife." 50 C.F.R. § 14.91. Cresenzi and Novak operate three of the five wildlife quarantine stations in the State of New York. These stations are approved and monitored by the federal government as part of a federal statutory and regulatory scheme to control

the introduction and spread of contagious disease among the poultry and animal populations of the the United States. 21 U.S.C. §§ 102–105, 111, 114, and 134, and 9 C.F.R. Part 92.

New York's Wild Bird Law was adopted in August 1984. It states:

> Except as permitted by rule and regulation of [DEC], no person shall sell live wild birds ... unless such birds were born and raised in captivity.

New York Environmental Conservation Law § 11–1728. The statute was adopted to halt commercial practices which the New York Legislature believed might lead to the extinction or near extinction of many species. The Legislature was concerned that many thousands of wild birds were dying as a result of cruel and careless practices during capture and transport to New York. It was hoped that the statute would remove New York from the market served by the importation of wild birds. *See* Memorandum in Support of Assembly Bill 11589, included in Bill Jacket to the Bill.

As authorized by statute, DEC developed regulations implementing the Wild Bird Law. The regulations gave importers two years to phase out prohibited business practices and shift into other areas, such as breeding bird species previously imported. The regulations define "sale" broadly, to include the delivery or transfer of a live wild bird for consideration, as well as an offer or solicitation to sell. 6 N.Y.C.R.R. § 174.1(h) (1985). Only sales that occur "within the state of New York" are prohibited. 6 N.Y.C.R.R. § 174.2. The regulations do not ban or limit the importation of wild birds into New York. Nor do they prevent a New York importer from making sales to out-of-state purchasers, so long as those sales are made from an office outside of New York. The regulations do not prohibit the quarantining of birds within the state. Enforcement of the statute is facilitated by regulations requiring that breeders, who sell captive-raised birds in New York, maintain records showing that the birds were raised in captivity, and affix to the birds leg bands which can be put on only at birth. 6 N.Y.C.R.R. §§ 174.7(c) and 174.9.

Plaintiffs brought suit on October 23, 1986 to challenge the Wild Bird Law. They sought a temporary restraining order and preliminary and permanent injunctions to prevent enforcement of the law. The application for a restraining order was denied by this Court on October 24, 1986. Thereafter, defendant filed this motion to dismiss. The United States Department of Justice and The National Audubon Society filed *amicus* briefs in support of defendants' motion. For the reasons stated below, plaintiffs' motion for preliminary and permanent injunctions is denied and plaintiffs' complaint is dismissed.

## DISCUSSION

### I. *Preemption*

"[W]hen Congress legislates within the scope of its constitutionally granted powers, that legislation may displace state law...." *Wardair Canada v. Florida Dep't of Revenue*, —— U.S. ——, ——, 106 S.Ct. 2369, 2372, 91 L.Ed.2d 1, 8 (1986). The Supreme Court has declared that, under the supremacy clause,

> state law may be pre-empted in either of two general ways. If Congress evidences an intent to occupy a given field, any state law falling in that field is pre-empted.... If Congress has not entirely displaced state regulation over the matter in question, state law is pre-empted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, ... or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress.

*Silkwood v. Kerr McGee Corp.*, 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984) (citations omitted). Of course, pre-emption is compelled whenever Congress explicitly so provides by statute. *See Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 738, 105 S.Ct. 2380, 2388, 85 L.Ed.2d 728, 739 (1985). Where the statutory language is ambiguous, however, "the first and fundamental inquiry ... is whether Congress intended to displace state law...." *Wardair Canada*, —— U.S. at ——, 106 S.Ct. at 2372, 91 L.Ed.2d at 8.

### a. *The Endangered Species Act*

Plaintiffs contend that, as applied to them, the New York statute is in conflict with federal regulation in the field of wildlife conservation. They allege that, pursuant to the Endangered Species Act of 1973, 16 U.S.C. §§ 1532–1543 ("ESA"), New York's Wild Bird Law may not interfere with the rights licensed to them by the Secretary of the Interior, under 50 C.F.R. § 14.91, to "engage in business as an importer or exporter of wildlife."

Wildlife is regulated concurrently by federal and state authorities. The earliest federal regulation in the field was the Lacey Act, 31 Stat. 188, enacted in 1900, which bolstered state policies by providing for federal prosecution of violators of state law who engage in interstate commerce. In 1966, Congress began regulating on its own. It passed the Endangered Species Act, §§ 1–3, 80 Stat. 926 (repealed 1973), which sought to protect native fish and wildlife threatened with extinction. The federal program was given an international focus in 1969, when Congress enacted the Endangered Species Conservation Act, 83 Stat. 275. That act resulted in the adoption of an international treaty, the 1973 Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"), 27 U.S.T. 1087, T.I.A.S., 8249.

In 1973, Congress enacted the present Endangered Species Act. Protective policies were established on three levels: international, national, and state. Consistent with Congress's international commitments, ESA implemented the CITES treaty. 16 U.S.C. § 1538(c). ESA also fortified preexisting national wildlife regulations. 16 U.S.C. § 1538(a). Finally, recognizing the benefits of local regulation, Congress, through ESA, encouraged the development of state conservation programs. 16 U.S.C. § 1535(b) and (c). Congress included a provision in ESA which spelled out when state laws should take priority over federal, and *vice versa.* The provision evinced a clear Congressional intent to preempt state wildlife conservation laws only to a very limited extent.

The legislative history of ESA indicates that the purpose for limiting any preemptive effect was to leave the states free to protect wildlife by restricting sales of endangered species within their jurisdiction, so long as they did not block federally permitted commerce. *See* Note, Federal Preemption of State Commerce Bans Under the Endangered Species Act, 34 Stan. L.R. 1323, 1329 (1982). The Senate believed that a federal wildlife program should not preempt similar state regulation. The committee responsible for the Senate bill reported that "[w]hile the Federal government should protect such species where States have failed to meet minimum Federal standards, it should not preempt efficient programs. Instead it should encourage these, and aid in the extension or establishment of others, to facilitate management by granting regulatory authority and making available financial assistance to approved schemes." Senate Comm. on Commerce, Report on the Endangered Species Act of 1973, S.Rep. No. 307, 93rd Cong., 1st Sess. (1973), *reprinted in* 1973 U.S. Code Cong. & Ad. News 2989, 2991 [Hereinafter Senate Report]. The Senate bill only preempted state laws in conflict with federal regulation of "interstate and foreign commerce of endangered species." Senate Report at 2993 and 2997.

Similarly, the Department of the Interior, which drafted the House amendment to the Senate bill, did not intend to preempt state sales bans. Members of the House subcommittee responsible for the amendment opposed complete preemption. States could ban local retail sales regardless of the origin of the product. They were not, however, to interfere with interstate shipments of products. Hearings on Endangered Species Before the Subcomm. on Fisheries and Wildlife Conservation and the Environment of the House Comm. on Merchant Marine and Fisheries, 93rd Cong., 1st Sess. 358–359 and 361 (1973) (comments of Reps. Eckhardt and Potter). The comments to the House draft were explicit: "[S]tate law is not pre-empted, but is merely subject to the Federal 'floor' of regulations under the Act. Thus laws already passed in States such as New York, California and Hawaii, which list additional species or prohibit such activities as sales

within their jurisdiction would remain unaffected." House Comm. on Merchant Marine and Fisheries, Report on the Endangered and Threatened Species Act of 1973, H.R.Rep. No. 412, 93rd Cong., 1st Sess. 14 (1973) (hereinafter cited as House Report).[1]

Congress has indicated that even state statutes which apply to interstate commerce[2] will not be preempted by ESA unless they conflict with affirmative federal regulation. Section 1535(f) indicates that:

> Any State law or regulation which applies with respect to the importation or exportation of, or interstate or foreign commerce in, endangered species or threatened species is void to the extent that it may effectively (1) permit what is prohibited by this Act, or (2) prohibit what is authorized pursuant to an exemption or permit provided for in this Act or in any regulation which implements this Act.

16 U.S.C. § 1535(f).[3] The New York Wild Bird Law does not provide for less protection that ESA. Therefore, the question to be resolved is whether New York's statute is a law that prohibits what is authorized pursuant to "an exemption or permit" provided for under ESA.

Both ESA and the regulations promulgated under it provide for certain limited exceptions to the regulation of wildlife. Congress has chosen to allow some importation of endangered species for national security reasons. 16 U.S.C. § 1536(j). During periods of transition, hardship cases have been exempted from ESA. 16 U.S.C. § 1539(b). ESA expressly provides for the issuance of permits authorizing the importation and sale of endangered species "for scientific purposes or to enhance the propagation or survival of the affected species" and for the operation of experimental populations. 16 U.S.C. § 1539(a)(1)(A); see 50 C.F.R. § 17.22. Finally, ESA provides for regulations under which the importation and trade in threatened species may be authorized. 16 U.S.C. § 1533(d); see 50 C.F.R. §§ 17.31–17.48.

Plaintiffs argue that the licenses they hold pursuant to 50 C.F.R. § 14.91 to "engage in business as an importer or exporter of wildlife," are "permits" or "exceptions" within the meaning of ESA. They rely on numerous decisions in the Ninth Circuit which hold that state laws which prohibit the sale of a threatened species may not constitutionally be applied to persons holding § 1539(d) permits. *Man Hing Ivory and Imports, Inc. v. Deukmejian*, 702 F.2d 760 (9th Cir.1983); *H.J. Justin & Sons, Inc. v. Deukmejian*, 702 F.2d 758 (9th Cir.), *cert. denied*, 464 U.S. 823, 104 S.Ct. 91, 78 L.Ed.2d 98 (1983); *Fouke Co. v. Brown*, 463 F.Supp. 1142 (E.D.Cal.1979).

---

**1.** Plaintiffs argue that the intent of the House drafters should be discounted. They stress that the preemption provision which Congress ultimately enacted was drafted by the Joint Committee based upon the Senate bill. Plaintiffs' Memorandum at 11. In writing a substitute for the House and Senate provisions, however, the Joint Committee favored the House draft. Comm. on Conference, Report on the Endangered Species Act, House Conf. Rep. No. 93–740, 93rd Cong. 1st Sess. 1973, *reprinted in* 1973 U.S. Code Cong. & Ad. News 3001, 3004.

**2.** We need not decide here whether the Wild Bird Law "applies" to interstate commerce within the meaning of § 1535(f) of ESA. Courts in the Ninth Circuit have ruled that such bans do affect interstate commerce. *E.g., H.J. Justin & Sons, Inc. v. Brown*, 519 F.Supp. 1383, 1387 (E.D.Cal.1981), *aff'd in part and rev'd in part on other grounds sub nom., H.J. Justin & Sons, Inc. v. Deukmejian*, 702 F.2d 758 (9th Cir.), *cert. denied*, 464 U.S. 823, 104 S.Ct. 91, 78 L.Ed.2d 98 (1983) *Contra* Note, Federal Preemption at 1329.

**3.** The provision states in full:
CONFLICTS BETWEEN FEDERAL AND STATE LAWS. Any State law or regulation which applies with respect to the importation or exportation of, or interstate or foreign commerce in, endangered species or threatened species is void to the extent that it may effectively (1) permit what is prohibited by this Act, or (2) prohibit what is authorized pursuant to an exemption or permit provided for in this Act or in any regulation which implements this Act. This Act shall not be otherwise construed to void any State law or regulation which is intended to conserve migratory, resident, or introduced fish or wildlife, or to permit or prohibit sale of such wildlife. Any State law or regulation respecting the taking of an endangered species or threatened species may be more restrictive than the exemptions or regulation which implements this Act but not less restrictive than the prohibitions so defined.
16 U.S.C. § 1535(f).

■ Defendant correctly answers that plaintiffs' licenses are not the "permits" or "exceptions" under § 1539 to which § 1535(f) refers. Plaintiffs' licenses are required as part of a general regulatory scheme authorized under several statutes including ESA, and federal criminal laws aimed at controlling inhuman and unhealthful conditions in the transportation of wild birds and animals. 16 U.S.C. § 1538(d); 18 U.S.C. § 42; see "Authority" for 50 C.F.R. Part 14. The purpose of such licenses is to track trade in CITES protected species more effectively. House Report at 16. The Interior Department's rules provide that a license "is only a permission to engage in business as an importer or exporter of wildlife." 50 C.F.R. § 14.93(d)(6). Congress expressed an intent to give permits issued pursuant to § 1539(d) a preemptive effect. Since it did not similarly indicate that a license granted under § 1538(d) would supersede more restrictive state laws, plaintiffs' federal licenses cannot be considered preemptive of New York's law. Accordingly, since the birds which plaintiffs sell are not sold pursuant to permits or an exception under ESA, their claim of preemption must be dismissed.

### b. *The Quarantine Regulations*

Cresenzi and Novak operate quarantine stations in New York State. Both plaintiffs contend that the New York Wild Bird Law conflicts with, and is therefore preempted by, the federal quarantine system.

Pursuant to 21 U.S.C. §§ 102–105, 111, 114, and 134 and 9 C.F.R. Part 92, in order to prevent the introduction of avian disease, every bird entering the United States is subject to quarantine as prescribed by the United States Department of Agriculture. Wildlife and birds may enter the United States only through seven designated ports of entry at which federally approved and supervised quarantine stations are located. These facilities must be near a major international airport, since almost all imported wildlife arrives by airplane. In addition, quarantine stations must be equipped in accordance with federal regulations. 9 C.F.R. § 92.11(e). Cresenzi and Novak allege that their operations are conducted as part of this federal statutory scheme. Complaint ¶ 13.

Plaintiffs do not contend that the New York Wild Bird Law directly prohibits their operation of federally approved quarantine stations in New York. They argue, however, that the law makes it economically impossible for them to continue their operations. Plaintiffs allege that the statute will "in essence ... result in the shut-down of the Novak and Cresenzi stations, as well as others and consequently, a shut-down of New York as a federally-designated port of entry." Complaint ¶ 34. They express concern that, because the New York ban applies to sales or offers made from New York offices to out-of-state customers, they will be unable to dispose of any birds quarantined in New York.

■ Defendants have made it clear, however, that the adoption of the Wild Bird Law has not rendered the New York quarantine stations obsolete. Importers of permitted wildlife will still have an interest in maintaining quarantine stations. New York has not banned the importation of birds. Birds imported through New York can be sold, as long as the transaction occurs out-of-state. For example, an importer can set up an office in New Jersey or Connecticut and arrange for birds imported through a New York airport to be sent to that office after the quarantine period is over. Plaintiffs' response that this loophole exposes the New York law as a "sham" is irrelevant for preemption purposes.

In addition, it is by no means evident that if plaintiffs are compelled, economically, to terminate their quarantine operations, "the full purposes and objectives of Congress" will be obstructed. *See Silkwood v. Kerr McGee Corp.*, 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984). The purpose of the quarantine laws was not to promote the importation of wildlife, but to reduce the risk that such importation would cause the spread of disease. The Federal Government's purposes will be furthered by the Wild Bird Law, since its effect will be to reduce the importation of wildlife. Since the New York statute does

not conflict with federal quarantine laws, plaintiffs' second claim of preemption must be dismissed.

## II. *Commerce Clause*

Plaintiffs contend that the New York law imposes an unconstitutional burden on interstate commerce. The Importers do not suggest that the ban on wild birds is anything but uniform and evenhanded. Yet they do contend that the New York law discriminates against out-of-state *breeders*, in that it requires, as a means of facilitating enforcement, that breeders intent on selling birds in the state keep records and fasten leg bands on the birds they wish to sell. Plaintiffs claim that "breeder[s] elsewhere would [not] bother with [the] leg bands and documentations required in New York [since] they could sell the birds without the same to purchasers in other states" and that the statute is therefore protectionist. Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss at 23.

■ A state is free to regulate matters of legitimate local concern, even though such regulation affects interstate commerce, provided that the effects on commerce are evenhanded, not discriminatory or protectionist. *Main v. Taylor,* —— U.S. ——, ——, 106 S.Ct. 2440, 2447, 91 L.Ed. 110, 120–121 (1986). Regulations that are discriminatory will still be valid if the state demonstrates that they serve a legitimate local purpose and are narrowly tailored to achieve that end. *Hunt v. Washington Apple Advertising Commission,* 432 U.S. 333, 353, 97 S.Ct. 2434, 2446, 53 L.Ed.2d 383 (1977).

■ Even assuming that the statute is protectionist,[4] the Wild Bird Law appears to meet the "legitimate purpose" and "least discriminatory method" tests. The Importers allege that the purpose of the Wild Bird Law must be "the preservation of world ecology," which they conclude is not a legitimate local concern. Plaintiffs' Memorandum at 26. Defendants and the

National Audubon Society correctly respond that "New York has a legitimate interest in regulating its local market conditions which lead, in a short causal chain, to the unjustifiable and senseless suffering and death of thousands of captured wild birds." National Audubon Society's Memorandum of Law as Amicus Curiae ("Audubon Memorandum") at 26. The State has an interest in cleansing its markets of commerce which the Legislature finds to be unethical. Moreover, a state may constitutionally conserve wildlife elsewhere by refusing to accept local complicity in its destruction. The states' authority to establish local prohibitions with respect to out-of-state wildlife has, since the late nineteenth-century, been recognized by the courts. *New York ex rel. Silz v. Hesterberg,* 211 U.S. 31, 41–43, 29 S.Ct. 10, 12–13, 53 L.Ed. 75 (1908). It is now well settled that the commerce clause does not prevent states from prohibiting sales within their borders as a means of protecting out-of-state wildlife. *Palladio v. Diamond,* 321 F.Supp. 630, 635 (S.D.N.Y.1970), *aff'd,* 440 F.2d 1319 (2d Cir.), *cert. denied,* 404 U.S. 983, 92 S.Ct. 446, 30 L.Ed.2d 367 (1971); *A.E. Nettleton Co. v. Diamond,* 27 N.Y.2d 182, 192–193, 264 N.E.2d 118, 123–124, 315 N.Y.S.2d 625, 632–633 *appeal dismissed sub nom. Reptile Products Assoc. v. Diamond,* 401 U.S. 969, 91 S.Ct. 1201, 28 L.Ed.2d 319 (1970).

Defendants have also met their burden of demonstrating that the New York statute is the least discriminatory means of withdrawing from the wild bird market. By requiring that breeders maintain records and place leg bands on birds sold in the state, New York has chosen a rational and effective way of enforcing its ban on wild bird sales. Plaintiffs do not suggest that any less restrictive alternatives exist, and it is hard to imagine a way in which the state could prohibit such commerce without requiring that birds sold in the state be

---

4. While I accept, for the sake of argument, plaintiffs' claim of protectionism, I highly doubt it. Far from protecting local commerce, the Wild Bird Law will oblige New York importers to either shift to breeding or move their operations to another state. *See* Letter from Pet Industry Joint Advisory Council to Governor Cuomo *in* Appendix I to Audubon Memorandum. It is not surprising that the plaintiffs alleging the discriminatory effect of the statute on out-of-state businesses are New York corporations.

identified as having been raised in captivity. Accordingly, plaintiffs' claim that the Wild Bird Law places an unconstitutional burden on interstate commerce must be dismissed.

### III. *First Amendment*

In their complaint, plaintiffs allege that the Wild Bird Law hampers commercial free speech in that it prohibits the offer or solicitation of illegal sales in catalogues, newspapers, magazines, or other forms of advertisement, 6 N.Y.C.R.R. § 174.1(h). The Supreme Court has made it clear that a state may constitutionally prohibit advertising where the underlying sale is illegal. *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 388, 93 S.Ct. 2553, 2560, 37 L.Ed.2d 669, *reh'g denied*, 414 U.S. 881 (1973). Accordingly, plaintiffs' claim has no merit and must be dismissed.

### IV. *Eleventh Amendment*

Defendants contend that the eleventh amendment bars this Court from deciding plaintiffs' claims four through seven. Plaintiffs, citing *Oneida County, NY v. Oneida Indian Nation of New York State*, 470 U.S. 226, 251, 105 S.Ct. 1245, 1260, 84 L.Ed.2d 169, *reh'g denied*, 471 U.S. 1062, 105 S.Ct. 2173, 85 L.Ed.2d 491 (1985), respond that the eleventh amendment does not apply to state law claims for injunctive relief against state officials. It is clear that the eleventh amendment does indeed prevent this Court from adjudicating such claims.

The grant of federal judicial power in article III is limited by the eleventh amendment's principle of sovereign immunity. *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 98, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Although the eleventh amendment expressly bars only suits by citizens of other states, it has long been recognized that "an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another state." *Employees v. Missouri Public Health Dept.*, 411 U.S.

279, 280, 93 S.Ct. 1614, 1615, 36 L.Ed.2d 251 (1973). Where the state is named as the defendant in a suit by a citizen, the eleventh amendment will bar the claim "regardless of the nature of the relief sought." *Pennhurst*, 465 U.S. at 100, 104 S.Ct. at 908. Where the suit, however, is against a state official, and involves a question of federal law, the eleventh amendment does not impart immunity to the officer from the supreme authority of the United States. A federal court may, in such circumstances, order prospective injunctive relief. *Ex Parte Young*, 209 U.S. 123, 160, 28 S.Ct. 441, 454, 52 L.Ed. 714 (1908). It may not, however, demand that the state pay the citizen damages. *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662, *reh'g denied*, 416 U.S. 1000, 94 S.Ct. 2414, 40 L.Ed.2d 777 (1974).

Plaintiffs argue that this Court is not barred from adjudicating their request for injunctive relief against defendant Henry Williams, Commissioner of DEC. Specifically, they suggest that under *Oneida* it matters "not at all whether the issues presented involved state law or federal law." The eleventh amendment, the Importers argue, only applies to cases involving "retroactive monetary relief." Plaintiffs' Memorandum at 28.

Plaintiffs are quite wrong. The language in *Oneida* relied upon by plaintiffs simply stressed that in a case for damages the eleventh amendment applies, regardless of whether the claim is based on federal or state law:

> The indemnification claim here, whether cast as a question of New York law or federal common law, is a claim against the state for retroactive monetary relief. In the absence of the State's consent … the suit is barred by the eleventh amendment.

105 S.Ct. at 1260 (J. Powell) (citation omitted). *Oneida* did not overrule *Pennhurst*. Indeed, Justice Powell relied on his *Pennhurst* opinion in finding an eleventh amendment bar in *Oneida*. *Id.* at 1261.[5]

---

**5.** In their brief plaintiffs complain that the State cites *Oneida* "without any regard for the factual context in which it was written." Plaintiffs'

Memorandum at 27–28. Plaintiffs then proceed to use the language of that opinion out of context.

The Supreme Court in *Pennhurst* held that *"Young* and *Edelman* are inapplicable in a suit against state officials on the basis of state law." 465 U.S. at 106, 104 S.Ct. at 911 (J. Powell). The *Pennhurst* Court, therefore, upheld a Pennsylvania official's claim that the eleventh amendment prohibits a district court from "ordering state officials to conform their conduct to State law." *Id.* at 97, 104 S.Ct. at 906.

I assume that plaintiffs concede that the eleventh amendment bars this Court's adjudication of their fourth, federal "taking," claim which asks for monetary damages, given that plaintiffs base their response to the eleventh amendment defense on the fact that they are only asking for injunctive relief. Additionally, since plaintiffs are requesting injunctive relief against a state official, defendants' eleventh amendment argument does not apply to the federal aspects of plaintiffs' fifth, "vagueness," claim.[6]

 Plaintiffs' claims four through seven also request injunctive relief against a state official on state law grounds. Since the eleventh amendment bars a federal court from granting a citizen damages from the state or from enjoining state officials on state law grounds, plaintiffs' claims four through seven must be dismissed to the extent that they seek such relief.

## V. *Abstention*

Defendants argue that this Court should abstain from deciding plaintiffs' claims five through eight. The State suggests that abstention would be appropriate under (1) *Railroad Comm'n of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), because the constitutional issues presented might be mooted by a more authoritative interpretation of the Wild Bird Law in the New York State courts; and (2) *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), because adjudication of plaintiffs' claims would disrupt the coherence of New York's ongoing regulatory scheme. Because I find that

*Pullman* requires that this Court abstain from deciding the remainder of plaintiffs' claims (i.e., the vagueness attack under the federal Constitution and the equal protection argument)[7], I need not reach the *Burford* abstention issue.

Plaintiffs make no effective response to defendants' argument for *Pullman* abstention. They merely argue that *"any* interpretation" of the Wild Bird Law "will require resolutions of issues of preemption." Plaintiffs' Memorandum at 38 (emphasis in original). I agree, and have therefore resolved the preemption question above. It is clear, however, that we cannot answer plaintiffs' vagueness and equal protection arguments without first permitting the New York courts to interpret the statute.

In the *Pullman* case, the Court refused to consider the merits of a constitutional challenge against an order of the Texas Railroad Commission. The Court held that since under one interpretation of the State's laws, the Commission was without the authority to make such an order, resolution of the constitutional question could await a definitive interpretation of the statute by the state courts. Where "constitutional adjudication plainly can be avoided if a definitive ruling on the state issue would terminate the controversy" the federal courts should abstain from ruling so as to "avoid the waste of a tentative decision as well as the friction of a premature constitutional adjudication." *Pullman,* 312 U.S. at 498 and 500, 61 S.Ct. at 645.

"Abstention from the exercise of federal jurisdiction is the exception, not the rule." *Colorado River Water Conservation District et al. v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976). Yet a federal court should abstain where a state statute is susceptible to an interpretation "by the state courts that would avoid or modify the constitutional issue." *Zwickler v. Koota,* 389 U.S. 241, 249, 88 S.Ct. 391, 396, 19 L.Ed.2d 444 (1967). Abstention in such a case "does

---

**6.** As is explained in the next section, I find it necessary to abstain from deciding the claim that the Wild Bird Law is vague in violation of the due process clause of the U.S. Constitution.

**7.** It appears that plaintiffs have abandoned their equal protection argument.

not depend upon a pending state action." *Cristina v. Department of State of New York,* 417 F.Supp. 1012, 1018 (S.D.N.Y. 1976). When considering possible abstention, the court should bear in mind that the "[i]nformed local courts may find meaning not discernible to the outsider." *Louisiana Power & Light Co. v. Thibodaux City,* 360 U.S. 25, 30, 79 S.Ct. 1070, 1073, 3 L.Ed.2d 1058 (1959). Moreover, where the state law in question has never before been interpreted, the federal court must abstain from resolving the avoidable constitutional issue:

> [W]e have held that the mere difficulty of state law does not justify a federal court's relinquishment of jurisdiction in favor of state court action.... But where the issue ... involved the scope of a previously uninterpreted state statute which, if applicable was of questionable constitutionality, ... we have required District Courts, and not merely sanctioned an exercise of their discretionary power, to stay the proceedings pending the submission of the state law question to state determination.

*Thibodaux City,* 360 U.S. at 27–28, 79 S.Ct. at 1072 (citations omitted).

■ The Court finds that it must abstain from resolving plaintiffs' vagueness and equal protection claims. Each of these claims might be mooted by interpretations of state law. For example, a state court determination that the Wild Bird Law is vague and thus void under N.Y. Const. art. I § 6, *see* Complaint ¶ 39, would render moot the issue of whether the statute is so vague as to deprive them of due process, U.S. Const. amend. XIV. Similarly, Supreme's equal protection claim will be mooted if the state court rejects plaintiffs' contention that Cresenzi and Novak's quarantine operations qualify them for an exemption from the Wild Bird Law as "state federal or local government agencies" within the meaning of the New York statute, *see* Complaint ¶ 41. Since the Wild Bird Law has not yet been interpreted by the New York courts, a forecast of how the New York Court of Appeals would rule on these state issues would be at best "a tentative answer which may be displaced tomorrow by a state adjudication." *Pull-*

*man,* 312 U.S. at 500, 61 S.Ct. at 645. Since the constitutional issues presented by plaintiffs fifth and eighth claims can be avoided, this Court must abstain from resolving them. Those claims must be dismissed.

## CONCLUSION

For the reasons outlined above, defendants' motion is granted and plaintiffs' complaint is dismissed. Plaintiffs' request for a preliminary injunction is therefore denied.

SO ORDERED.