

# THE ATTORNEY GENERAL
## OF TEXAS

**JIM MATTOX**
**ATTORNEY GENERAL**

December 12, 1990

Honorable Bob Bullock
Comptroller of Public
    Accounts
L.B.J. Office Building
Austin, Texas 78774

Opinion No. JM-1258

Re: Validity of import fees
on barges pursuant to section
26.3574 of the Water Code
(RQ-2039)

Dear Mr. Bullock:

Chapter 26 of the Water Code sets forth comprehensive regulatory provisions regarding water quality control in this state. Subchapter I of chapter 26 governs the registration and regulation of operators of underground and aboveground storage tanks that contain certain hazardous, toxic, or otherwise harmful substances.

In 1989 the legislature enacted a bill that, _inter alia_, amended subchapter I, creating a petroleum storage tank remediation fund and a storage tank fund in the state treasury for the cleanup of releases from certain petroleum storage tanks and tanks containing regulated substances, as defined by the act. Acts 1989, 71st Leg., ch. 228, §§ 16, 18, at 1015, 1020. _See generally_ Attorney General Opinion JM-963 (1988). The petroleum storage tank remediation fund consists, in part, of fees imposed by section 26.3574 of the Water Code. Water Code § 26.3573(b)(2).

You ask whether, in light of our holding in Attorney General Opinion JM-714 (1987), the import fee imposed on barges pursuant to subsection (d) of section 26.3574 of the Water Code is "invalid." In Attorney General Opinion JM-714, we concluded that a proposed amendment to the petroleum severance tax provisions of the Tax Code that would have imposed a tax on imported petroleum would violate the commerce clause of the United States Constitution. Therefore, we understand you to ask whether section 26.3574 of the Water Code also violates the commerce clause. We conclude that it does. We do not understand you to ask about, and accordingly we do not address, other constitutional provisions, specifically the privileges and immunities and equal protection clauses of the federal Constitution. We will first discuss the relevant Water Code provisions. Then we will discuss United States Supreme Court

cases regarding state regulation that affects interstate commerce.

Section 26.3573 of the Water Code creates in the state treasury the petroleum storage tank remediation fund, which consists, in part, of fees charged under section 26.3574 of the Water Code. Section 26.3574 of the Water Code provides in pertinent part:

(a)  In this section:

(1)  'Bulk facility' means a facility, including pipeline terminals, refinery terminals, rail and barge terminals, and associated underground and aboveground tanks, connected or separate, <u>from which petroleum products are withdrawn from bulk and delivered into a cargo tank or a barge used to transport those products</u>. This term does not include petroleum products consumed at an electric generating facility.

(2)  'Cargo tank' means an assembly that is used for transporting, hauling, or delivering liquids and that consists of a tank having one or more compartments mounted on a wagon, truck, trailer, railcar, or wheels.

(3)  'Withdrawal from bulk' means the removal of a petroleum product from a bulk facility storage tank <u>for delivery directly into a cargo tank or a barge</u> to be transported to another location other than another bulk facility for distribution or sale in this state.

(b)  <u>A fee is imposed on the delivery of a petroleum product on withdrawal from bulk of that product as provided by this subsection</u>. Each operator of a bulk facility on withdrawal from bulk of a petroleum product shall collect from the person who orders the withdrawal a fee in an amount determined as follows:

[sets forth graduated schedule of fees based upon tank size for 'each delivery <u>into a cargo tank</u>' but omits any reference to a delivery into a barge]

. . . .

> (d)  A person who imports a petroleum product in a cargo tank or a barge destined for delivery into an underground or aboveground storage tank, regardless of whether or not the tank is exempt from regulation under Section 26.344 of this code [which sets forth exemptions from the regulation provisions of the subchapter], other than a storage tank connected to or part of a bulk facility in this state, shall pay to the comptroller a fee on the number of gallons imported, computed as provided by Subsections (b) and (c) of this section. If a bulk facility operator imports a petroleum product in a cargo tank or a barge, the bulk facility operator is not required to pay the fee on that imported petroleum product if the petroleum product is delivered to a bulk facility from which the petroleum product will be withdrawn from bulk.

. . . .

> (f)  Subsection (b) of this section does not apply to a delivery of a petroleum product destined for export from this state if the petroleum product is in continuous movement to a destination outside this state.  (Emphasis added.)

Thus, under subsection (d) of section 26.3574, a person who imports[1] in a cargo tank or a barge a petroleum product destined for delivery into an underground or aboveground storage tank will pay a fee based upon the number of gallons imported when the product is delivered.  If an operator of a bulk facility imports a petroleum product in a cargo tank or

---

1.  It is unclear whether the word "import" is intended only to reach petroleum products that enter Texas from another country, or petroleum products that enter Texas from another state as well.  See Attorney General Opinion JM-714 (1987).  Because it is unlikely that petroleum products from another country would be delivered to Texas in a barge, as opposed to a tanker, we think it reasonable that "import" refers to interstate delivery of a petroleum product.  For purposes of this opinion, we assume that "import" refers to both foreign and interstate delivery.

a barge, the bulk facility  operator is not required to  pay the fee  if  the  bulk facility  into  which  the  petroleum product is delivered is one from which the product ultimately will be withdrawn.  Under subsection (b), the fee  effectively is passed through.

Under subsection (b) of section 26.3574, any person who orders the withdrawal  of a  petroleum product  from a  bulk facility into a  cargo tank (but  not into a  barge) is  required to pay a fee to  be collected by the operator of  the bulk facility  based upon  the number  of gallons  withdrawn when the  product is  delivered.[2] The  operator of  a  bulk facility will pay the fee only  in an instance in which  the petroleum product is not withdrawn.

Thus, under subsections (b) and (d), taken together,  a person who  orders a  withdrawal from  bulk of  a petroleum product into a cargo tank (but not into a barge) is  subject to the  fee when  the product  is delivered.   Similarly,  a person who "imports" a petroleum  product in either a  cargo tank or a  barge is  subject to a  fee when  the product  is delivered.  In other words, a person who "imports" a  petroleum product by barge  from Louisiana will  be subject to  a fee when the product is delivered to an underground  storage

---

2.   Based upon the omission of the word "barges" in the fee schedule set  forth in subdivisions  (1) through (5)  of subsection (b),  you construe  subsection (b)  not to  reach operators of intrastate barges.  We note that subsection (b) can  be  construed  to  impose  that  fee  on  operators  of intrastate barges or, in the alternative, to impose a fee in an unspecified amount on operators of intrastate barges.

Three arguments support that construction.  First, that construction would  comport  with  the  evident  legislative intent of imposing the delivery  fee upon those persons  who are most likely  to be  involved with a  petroleum spill  or leak.   Second,  the  definitions  of  "bulk  facility"  and "withdrawal from bulk" set  forth in subsection (a)  include delivery of a petroleum product  into a barge.  Third,  that construction will overcome serious constitutional objections to the statute. We are  required to construe a statute,  if it is possible to do so, in a manner that is constitutional. A construction  of subsecton  (b)  of section  26.3574  that imposes the delivery fee on operators of intrastate  barges, in addition to  operators of intrastate  cargo tanks,  would overcome equal protection and commerce clause challenges  to the statute.   However, for  purposes of this  opinion, we accept your construction.

tank in Galveston; however, a person who delivers a petroleum product by barge from Texas City for delivery to an underground storage tank in Galveston will not be subject to the fee.[3] We understand you to ask about the imposition of the fee on those persons who "import" a petroleum product in a barge. We understand you to ask whether the imposition of the fee on only those persons who deliver interstate by barge, as opposed to those who deliver intrastate by barge, violates the commerce clause of the United States Constitution.

The United States Constitution expressly reserves to the federal government the authority to regulate commerce with foreign countries, as well as among the states. The commerce clause provides: "The Congress shall have Power . . . To regulate commerce with foreign Nations, and among the several States, and with the Indian Tribes." U. S. Const. art. I, § 8, cl. 3.

The commerce clause has been interpreted not only as conferring power on the national government to regulate commerce, but also as limiting the states' powers to interfere with commerce. This restriction on state power often is referred to as the "negative implication of the commerce clause" or as the "dormant commerce clause" principle. See, e.g., Wardair Canada, Inc. v. Florida Dep't of Revenue, 477 U.S. 1 (1986). Under the dormant commerce clause, the United States Supreme Court has held unconstitutional a variety of state regulatory programs[4] and taxation measures[5] as unduly burdening commerce.

---

3. We note that a person who delivers a petroleum product by cargo tank, whether intrastate or interstate, is subject to the fee.

4. See, e.g., Great Atlantic & Pacific Tea Co. v. Cottrell, 424 U.S. 366 (1976) (holding unconstitutional a Mississippi regulation providing that out-of-state milk could be sold in Mississippi only if the producing state would accept Mississippi milk on a reciprocal basis); Pike v. Bruce Church, Inc., 397 U.S. 137 (1970) (holding unconstitutional a state regulatory order prohibiting person from shipping cantaloupes outside the state unless they were packed in state-approved containers).

5. See, e.g., Bacchus Imports, Ltd. v. Dias, 468 U.S. 263 (1984) (holding that a state tax on alcoholic beverages that exempted certain locally produced beverages was uncon-
(Footnote Continued)

In Attorney General Opinion JM-714, we concluded that a court would probably hold that a proposed amendment to the petroleum severance tax provisions of the Tax Code that would have imposed a state tax on petroleum imported from other states would violate the commerce clause of the United States Constitution. Based upon the test enunciated in Complete Auto Transit, Inc. v. Brady, 430 U.S. 274 (1977), and the holding of Maryland v. Louisiana, 451 U.S. 725 (1981), we predicted that a court would hold that such an import tax on petroleum would impermissibly burden interstate commerce. But we do not construe the fee imposed by section 26.3574 of the Water Code to impose an import tax on petroleum; therefore, Attorney General Opinion JM-714 does not control your question. In Attorney General Opinion JM-963 (1988), we concluded that a proposed delivery fee on petroleum products that was used to create a state cleanup fund in order to comply with federal statutes was not a tax. Rather, we concluded that such an exaction would be imposed in connection with the conferral of regulatory authority on the state and is more closely analogous to a license fee.

The United States Supreme Court very early on distinguished under the commerce clause the state power to tax from the state power to regulate commerce. Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 199-200 (1824).[6] The current

---

(Footnote Continued)
stitutional); Boston Stock Exchange v. State Tax Comm'n, 429 U.S. 318 (1977)(holding that New York transfer tax on securities transactions was unconstitutional because transactions involving out-of-state sales were taxed more heavily than most transactions involving a sale within the state).

6. In Gibbons, the Supreme Court struck down a state-granted monopoly for the operation of steamboats that had the effect of prohibiting the operation of a federally licensed steamboat in New York waters. The court focused on the origin of the power at issue, whether commerce power or police power, and distinguished the commerce power from the subject matter upon which that power operated. The court concluded that while a state could not regulate "commerce" for its own sake, it might, in the pursuit of other legitimate state goals (such as the public health and safety under the police power), take actions that might impinge to some extent upon commerce upon the states.

In Cooley v. Board of Wardens, 53 U.S. (12 How.) 299 (1851), the court set forth a test for commerce clause ad-
(Footnote Continued)

test employed by the Supreme Court in determining whether a state regulation violates the commerce clause is not the four-prong test for state taxation schemes set forth in Complete Auto Transit, supra; instead, the court invokes a balancing test first adopted in Southern Pacific Co. v. Arizona, 325 U.S. 761, 768-71 (1945).[7]

Essentially, the court has adopted what amounts to a two-tiered approach to state economic regulation under the commerce clause. When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, the court generally has struck down the statute without further inquiry. See, e.g., Brown-Forman Distillers Corp. v. New York State Liquor Auth., 476 U.S. 573 (1986); Edgar v. MITE Corp., 457 U.S. 624 (1982); Hughes v. Oklahoma, 441 U.S. 322 (1979); City of Philadelphia v. New Jersey, 437 U.S. 617 (1978). When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, the court has examined whether the state's burden is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits. Pike v. Bruce Church, Inc., 397 U.S. 137 (1970). The court has also recognized that there is no clear line separating those sorts of state regulation that are virtually per se invalid under the commerce clause and those sorts of regulation subject to the Pike balancing approach. In either situation, the court focuses on the overall effect of the statute on both local and interstate activity. Brown-Forman Distillers Corp., supra; Raymond Motor Transp., Inc. v. Rice, 434 U.S. 429 (1978).[8]

---

(Footnote Continued)
judication that lasted almost 100 years. The court upheld a Pennsylvania law requiring ships entering or leaving the port of Philadelphia to engage a local pilot. The court sustained the act on the basis of a distinction between those subjects of commerce that demand a uniform rule throughout the country and those subjects that permit diversity of treatment in order to satisfy local concerns.

7. The test was first formulated by Professor Noel T. Dowling in a seminal law review article. See Dowling, Interstate Commerce and State Power, 27 Va. L. Rev. 1 (1940).

8. In other words, state regulation affecting interstate commerce typically will be upheld if (1) the regulation is rationally related to a legitimate state end,
(Footnote Continued)

In the leading case of <u>Pike v. Bruce Church, Inc.</u>, 397 U.S. 137 (1970), the court struck down an Arizona regulatory order prohibiting a person from shipping cantaloupes outside the state unless they were packed in state-approved containers. The court declared:

> Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. . . . If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

<u>Id.</u> at 142; <u>see also</u> <u>MITE Corp.</u>, <u>supra</u> (striking down an Illinois statue that directly regulated and prevented, unless the terms of the statute were satisfied, interstate tender offers); <u>Lewis v. BT Investment Managers, Inc.</u>, 447 U.S. 27 (1980) (striking down Florida statutory scheme prohibiting investment advisory services by bank holding companies with principal offices out of state); <u>Hughes v. Oklahoma</u>, <u>supra</u> (striking down Oklahoma statute prohibiting the export of natural minnows from the state); <u>City of Philadelphia v. New Jersey</u>, <u>supra</u> (striking down New Jersey statute prohibiting importation of solid and liquid wastes into the state); <u>Hunt v. Washington State Apple Advertising Comm'n</u>, 432 U.S. 333 (1977) (striking down North Carolina

---

(Footnote Continued)
and (2) the regulatory burden imposed on interstate commerce, and any discrimination against it, are outweighed by the state interest in enforcing the regulation. <u>See generally</u> Tribe, <u>American Constitutional Law</u>, ch. 6 (2nd ed. 1988); Rotunda, Nowak, & Young, <u>Treatise on Constitutional Law: Substance and Procedure</u>, ch. 11 (1986). <u>See also</u> Redish & Nugent, <u>The Dormant Commerce Clause and the Constitutional Balance of Federalism</u>, 87 Duke L. J. 569 (1987); Eule, <u>Laying the Dormant Commerce Clause to Rest</u>, 91 Yale L. J. 425 (1982); Maltz, <u>How Much Regulation is Too Much -- An Examination of Commerce Clause Jurisprudence</u>, 50 Geo. Wash. L. Rev. 47 (1981); Tushnet, <u>Rethinking the Dormant Commerce Clause</u>, Wis. L. Rev. 125 (1979).

statute imposing additional costs on Washington, but not on North Carolina, apple shippers).

We think that a court would hold that the failure of the Texas statute to impose those burdens upon intrastate barge operators that are imposed upon interstate (or foreign) barge operators would not constitute evenhanded regulation and, therefore, would amount to impermissible discrimination under the commerce clause under the United States Constitution.

## S U M M A R Y

The failure of section 26.3574 of the Water Code to impose the same burdens upon intrastate operators of barges delivering petroleum products that are imposed upon interstate (and foreign) operators of barges delivering petroleum products would not constitute evenhanded regulation and, therefore, would amount to impermissible discrimination under the commerce clause of the United States Constitution.

Very truly yours

JIM MATTOX
Attorney General of Texas

MARY KELLER
First Assistant Attorney General

LOU MCCREARY
Executive Assistant Attorney General

JUDGE ZOLLIE STEAKLEY
Special Assistant Attorney General

RENEA HICKS
Special Assistant Attorney General

RICK GILPIN
Chairman, Opinion Committee

Prepared by Jim Moellinger
Assistant Attorney General