**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 97-20203
Summary Calendar

PAT BULLARD,

Plaintiff-Appellant,

VERSUS

CITY OF HOUSTON, ET AL,

Defendants-Appellees.

Appeal from the United States District Court
For the Southern District of Texas, Houston Division
(CA-H-95-762)

November 26, 1997

Before DUHÉ, DEMOSS, and DENNIS, Circuit Judges.

PER CURIAM:[1]

Plaintiff Pat Bullard ("Bullard") appears before this Court a

second time[2] in his suit alleging retaliatory discharge for the

---

[1]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[2] His first appearance resulted in our dismissal of his substantive due process claims under 42 U.S.C. § 1983, our affirmance of the denial of official immunity under state law with respect to the state claims, and our conclusion that he had stated a claim for a violation of his First Amendment rights. Bullard v. City of Houston, 95 F.3d 48 (5th Cir. 1996).

exercise of his First Amendment rights to testify truthfully in court and to speak out on a matter of public concern. He now appeals the summary judgment dismissal of his claims of retaliatory discharge against Harris County assistant district attorneys ("ADAs") John Miles ("Miles"), Baldwin Chin ("Chin"), and Kelly Colquette ("Colquette") on grounds of qualified immunity. Bullard also appeals the dismissal of his conspiracy claim against the individual defendants, of his defamation claim against Colquette, and of his claim against the City of Houston ("Houston").[3] We affirm.

## I.

Bullard was employed by the Houston Police Department ("HPD") as a civilian Police Service Officer ("PSO"). His primary duties included interviewing and administering sobriety tests on videotape to DWI suspects. Additional duties were to testify at trial, authenticating the videotapes and presenting his observations made during the videotaping. During his employment, Bullard was the object of several Internal Affairs Division (IAD) investigations. The investigations pertinent here arose from Bullard's conduct relating to two DWI trials.

In preparation for the first DWI trial at issue ("the Edwards trial"), ADA Miles met with Bullard to review the videotape Bullard

---

[3]All other issues arising from his district court suit that Bullard has not briefed on appeal are waived. Franceski v. Plaquemines Parish School Board, 772 F.2d 197, 199 (5th Cir. 1985).

2

had made of Edwards and Bullard's expected testimony about the tape and Edwards' speech and behavior. Miles structured the state's presentation based upon what he believed to be Bullard's observations. During his testimony, Bullard was either unable or unwilling to testify as Miles thought he would. Because the prosecution's case was based on Bullard's expected but undelivered testimony, Edwards was acquitted. Miles complained to an HPD supervisor about Bullard's lack of cooperation with the District Attorney's office and his perceived incompetence. The supervisor initiated an IAD investigation.

Bullard's conduct at a second DWI trial ("the Smith trial") resulted in another IAD investigation. Again, Bullard's testimony was inconsistent with what he had led the ADAs at pretrial meetings to believe he would say. After a discussion about this inconsistency with the ADAs, an HPD officer initiated an IAD complaint based on Bullard's alleged violation of the HPD's Civilian Rules and Regulations ("the Regulations").

Following hearings, the HPD chief recommended indefinite suspension, which was followed by a final decision by the mayor for termination. Bullard's termination was affirmed by the Civil Service Commission.

## II.

We review a grant of summary judgment de novo pursuant to the usual standards. Fed. R. Civ. P. 56(c); Nowlin v. Resolution Trust Corp., 33 F.3d 498, 502 (1994); Celotex Corp. v. Catrett, 477 U.S.

3

317, 322 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986). We view the facts and inferences in the light most favorable to the non-movant. Faruki v. Parsons S.I.P, Inc., 123 F.3d 315, 318 (5th Cir. 1997).

## III.

The individual defendants moved for dismissal based on qualified immunity. The qualified immunity analysis is a familiar one. We first determine whether the plaintiff has alleged the violation of a constitutional right. Siegert v. Gilley, 500 U.S. 226, 231 (1991). If so, we next decide if the right was clearly established at the time the challenged conduct occurred and whether the defendant's conduct was objectively reasonable. Hale v. Townley, 45 F.3d 914, 917 (5th Cir. 1995).

Bullard alleges that he was discharged in retaliation for his truthful testimony at the Edwards and Smith trials. Trial testimony is speech protected by the First Amendment. Johnston v. Harris County Flood Control Dist., 869 F.2d 1565, 1578 (5th Cir. 1989).

We assume, without deciding, that Bullard has established a prima facie case of truthful testimony. We next decide if an objectively reasonable official would have known that the institution of an IAD investigation and the submission of affidavits regarding inconsistencies in pre-trial and trial testimony and violations of HPD regulations violated Bullard's clearly established First Amendment rights. To determine that the

4

defendants are not entitled to qualified immunity, it must be apparent that they knew their conduct violated a clearly established right, not that, in some sense, they were doing something wrong. <u>Foster v. City of Lake Jackson</u>, 28 F.3d 425, 430 (5th Cir. 1994).

As a civilian employee, Bullard was subject to the Regulations.[4] His infractions of these regulations were the subject of the complaints made by the ADAs that resulted in IAD investigations and Bullard's subsequent termination. We hold that their submissions of affidavits upon IAD request could be viewed by other public officials as objectively reasonable reactions to Bullard's conduct rather than actions that clearly violate Bullard's right to give truthful testimony free from the threat of retaliatory discharge.

The ADAs' complaints centered on the inconsistencies between Bullard's pretrial statements and his actual testimony. The ADAs reasonably expected that Bullard's trial testimony would be consistent with the information he provided them at the pre-trial meetings. In the Edwards trial preparation, by his own admission, Bullard failed to correct ADA Miles' understanding that Bullard

---

[4]<u>Inter alia</u>, these included (1) having the ability and willingness to satisfactorily perform assigned duties pertaining to their jobs; (2) cooperation with all agencies engaged in the administration of criminal justice and other public departments, giving aid to each, all aid and information they may be entitled to receive; and (3) speaking the truth at all times, whether under oath or not in connection with official duties.

agreed that Edwards was "thick-tongued."[5]  Although Bullard did not hesitate in describing Edwards's physical performance on these tests, he did not directly answer questions about Edwards's intoxication.[6]   He would not articulate for the jury things he observed about the defendant that indicated intoxication despite having viewed the videotape at least twice.  Bullard indicated only that there was some "impairment" when asked if a sway on the head tilt test was indicative of "intoxication."  He then announced that what he had testified to could be seen on the tape.  Underlying Miles's affidavit, submitted in response to an IAD request, was his reasonable expectation that Bullard would be forthright with him, letting him know at the pre-trial meeting that he thought the suspect's performance on some of the tests was inconsistent with a state of intoxication.

Bullard's same lack of candor and forthrightness formed the basis for a complaint filed with IAD after the Smith trial.  ADAs Chin and Colquette's affidavits indicated that Bullard had told

---

[5]"I got the feeling that he thought I was going to testify to the defendant being thick-tongued."  While on the stand during the trial when asked if there was anything notable about Edwards's speech, Bullard responded "I don't believe so, sir."  Bullard even admitted that although it was fair that an attorney know what he, as a witness, would testify to before putting him on the stand that he felt no need to tell Miles he disagreed with him.  He stated "I wasn't going to argue with Mr. Miles. . .I wasn't going to say anything."

[6]His response was that Edwards did not follow instructions when asked if the suspect's heel-to-toe test indicated that he was "intoxicated."

6

them during the Smith pre-trial meeting he had not formulated an opinion about Smith's intoxication and was not trained to do so. His cross-examination testimony was that Smith was not "highly impaired,"[7] performed better than the average suspect on sobriety tests, and performed satisfactorily on the one-leg test.  Chin and Colquette reasonably expected that Bullard's trial testimony would be consistent with the information he provided them at the pre-trial meeting.  They felt it was not.[8]

It is clear that Bullard's lack of forthrightness and the apparent inconsistencies in his pre-trial and trial statements indicate a lack of cooperation with the ADAs who are part of an agency engaged in the administration of criminal justice.  It is equally clear from Bullard's own sworn statement that he did not give all aid and information the ADAs were entitled to receive to properly prepare for the DWI trials nor was he willing to do so. We conclude that it was not objectively unreasonable to submit a statement to IAD investigators regarding the inconsistencies in Bullard's trial testimony and his perceived incompetence.  The ADAs, as reasonable government officials, know only that they must not infringe on Bullard's free speech rights, but would not

---

[7]Bullard apparently draws a distinction between intoxication and impairment.  He failed to explain this distinction to the ADAs as they were formulating their trial strategy and planning for their witnesses.

[8] Statements gathered during the IAD investigations of Bullard's trial conduct showed a lack of confidence among ADAs in Bullard's competence and willingness to cooperate.

necessarily know that submission of affidavits upon request would be prohibited conduct. See Anderson, 483 U.S. at 640.

In reaching this conclusion, we note that the district court found that the individual defendants had no authority to directly affect Bullard's employment and acted in their official capacities to report Bullard's misconduct and infractions of rules. We agree that the actions of these governmental employees were objectively reasonable, as they followed established IAD procedures for the investigations of violations. See Johnston v. City of Houston, 14 F.3d 1056, 1059 (5th Cir. 1994).

Because Bullard's claim of retaliatory discharge fails, his claim of conspiracy to violate his constitutional rights also fails. See Hale, 45 F.3d at 920.

We also affirm the district court's judgment against Bullard dismissing his defamation claim against Colquette. We agree that as a matter of law, the statements attributed to Colquette are not defamatory.[9] She plainly expressed her opinion of Bullard's performance based on her courthouse experiences. Her statement that Bullard "generally supports" a defendant's defense does not

---

[9]In her affidavit Colquette swore that it was her opinion based on discussions with other attorneys and her experiences and observations of DWI cases that "it is common knowledge amongst several defense attorneys...that they should not stipulate to the video-tape whenever Pat Bullard is the P.S.O. because [he] generally supports their defense."

8

meet the statutory definition of libel.[10]

Colquette's statements in her affidavit submitted as part of the IAD investigation are absolutely privileged under state law when made in the context of a quasi-judicial investigation, such as that of the IAD. See Putter v. Anderson, 601 S.W. 2d 73 (Tex. App. - Dallas 1980, writ ref'd n.r.e.). Additionally, a qualified privilege attaches to statements made under circumstances in which any one of several persons having a common interest in a particular subject matter may reasonably believe that facts exist that another, sharing that common interest, is entitled to know. McDowell v. State, 465 F.2d 1342, 1344-45 (5th Cir. 1971). Because Colquette had a common interest with the HPD in insuring the quality and credibility of a witness responsible for assisting in the investigation of criminal offenses, only actual malice is sufficient to overcome this privilege. Even if she possessed ill will, Colquette's statements do not rise to the actual malice needed to defeat the privilege. Conticommodity Services v. Ragan, 63 F.3d 438, 442 (5th Cir. 1995), cert. denied, __U.S.__, 116 S.Ct. 1318 (1996), citing Haglar v. Proctor & Gamble, 884 S.W. 2d 771

---

[10]See Tex. Civ. Prac. & Rem. Code Ann. § 73.001 (Vernon 1986):

> A libel is a defamation expressed in written or other graphic form...that tends to injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation... .

9

(Tex. 1994).

Bullard complains that the district court granted Houston's summary judgment on an issue not raised and without notice. A district court may grant summary judgment sua sponte so long as the losing party was on notice that he had to come forward with all his evidence.[11] Houston's dismissal was granted on grounds raised by another defendant, Harris County,[12] that Bullard had not shown his termination resulted from a custom or policy of the political entity.[13] Bullard chose not to respond to the Harris County motion and presented no evidence of custom or policy, although he sued all of the individual defendants in their official capacities as well as the political entities of Harris County and the City of Houston.

In filing his suit against the public entities, Bullard should have been aware of the identical elements of proof needed both for his claims against the county and for his claims against Houston. The district court did not err in dismissing Bullard's claim against Houston on grounds other than those requested by the city.

IV.

For all of the above reasons, we affirm the summary judgments granted by the district court.

---

[11]Nowlin, 33 F.3d at 504, n.9, citing Celotex, 477 U.S. at 326.

[12]Harris County was dismissed earlier on a motion for summary judgment by the U.S. District Court for the Southern District of Texas, Houston Division, No. H-95-0762 (Feb. 12, 1997).

[13]See Monell v. Department of Soc. Serv. of City of New York, 436 U.S. 658 (1978); Kentucky v. Graham, 473 U.S. 159, 166 (1985).

AFFIRMED.