868 P.2d 1048

**MYRTLE MANOR APARTMENTS, an Arizona limited partnership, and Morningside Villa Apartments, an Arizona limited partnership, Plaintiffs, Counterdefendants–Appellants, Cross Appellees,**

v.

**CITY OF PHOENIX, a municipal corporation, Defendant, Counterclaimant–Appellee, Cross Appellant.**

No. 1 CA–TX 91–0040.

Court of Appeals of Arizona, Division 1, Department T.

Jan. 18, 1994.

As Amended Feb. 18, 1994.

Newman, Ahern, Chambliss & Banen by Kevin T. Ahern and Copple, Chamberlin & Boehm, P.C. by Scott E. Boehm, Phoenix, for plaintiffs, counterdefendants-appellants, cross appellees.

Roderick G. McDougall, Phoenix City Atty. by James H. Hays, Asst. City Atty., Phoenix, for defendant, counterclaimant-appellee, cross appellant.

## OPINION

GARBARINO, Judge.

Taxpayers Myrtle Manor Apartments and Morningside Villa Apartments appeal from a judgment in favor of the City of Phoenix on refund claims for Phoenix privilege taxes assessed on sums the taxpayers received under housing assistance payment (HAP) contracts funded by the United States Department of Housing and Urban Development (HUD). The City cross-appeals from the tax court's holding that the value of the taxpayers' on-site managers' use of apartment units was not includable in the taxpayers' gross income. We consider:

(1) Whether the tax court erred in holding that HUD housing assistance payments to the taxpayers were taxable under Phoenix tax code sections 14–2 or 14–445(a) as "gross income from the business activity ... of leasing ... or renting real property located within the city;"

(2) Whether the tax court erred in concluding that federal law did not preempt application of the city's real property rental income privilege tax to HUD housing assistance payments; and

(3) Whether the tax court erred in holding that the value of services performed by the taxpayers' on-site managers in partial exchange for personal use of apartment units was not taxable as gross income from the business of renting real property.

We have jurisdiction pursuant to A.R.S. section 12–2101(B).

## FACTS AND PROCEDURAL HISTORY

The taxpayers borrowed funds from First Interstate Bank to construct multi-family housing complexes, and HUD agreed to insure the loans. To obtain the HUD guarantee, each taxpayer signed a "regulatory agreement for insured multi-family housing projects." The agreements required each taxpayer to enter into a HAP contract under which the taxpayer would rent apartment units to low-income persons in return for HUD subsidy payments on each unit.

The HUD program authorizing these agreements, known as the "General Program of Assisted Housing," is governed by 42

U.S.C. sections 1437 through 1437w. Section 1437 sets forth the federal government's policy of promoting the general welfare of the nation by assisting the states and their political subdivisions in providing safe and sanitary dwellings for low-income families, while vesting local public housing agencies with the maximum amount of responsibility for administering these programs. Section 1437a fixes eligibility criteria for low-income housing and caps the percentage of monthly income a family may be charged as rent.

Section 1437f determines the amount of housing assistance payments due owners of low-income housing. A HAP contract establishes the maximum monthly rent, including utilities and all maintenance and management charges, that the owner is entitled to receive on each dwelling unit for which assistance payments are to be made. 42 U.S.C. 1437f(c)(1). Maximum monthly rents may not exceed by more than ten percent the rental value set by HUD for the relevant market area. *Id.*

Section 1437f(c)(2) provides in part:

(A) The assistance contract shall provide for adjustment annually or more frequently in the maximum monthly rents for units covered by the contract to reflect changes in fair market rentals established in the housing area for similar types and sizes of dwelling units or, if the [HUD] Secretary determines, on the basis of a reasonable formula.

(B) The contract shall further provide for the Secretary to make additional adjustments in the maximum monthly rent for units under contract to the extent he determines such adjustments are *necessary to reflect increases in the actual and necessary expenses of owning and maintaining the units which have resulted from substantial general increases in real property taxes, utility rates, or similar costs which are not adequately compensated for by the adjustment in the maximum monthly rent authorized by subparagraph (A).* The Secretary shall make additional adjustments in the maximum monthly rent for units under contract ... to the extent the Secretary determines such adjustments are necessary to reflect increases in the actual and necessary expenses of owning and maintaining the units that have resulted from the expiration of a real property tax exemption.

(Emphasis added.) Section 1437f(c)(3)(A) provides in part: "The amount of the monthly assistance payment with respect to any dwelling unit shall be the difference between the maximum monthly rent which the contract provides that the owner is to receive for the unit and the rent the family is required to pay under section 1437a(a) of this title."

HUD has adopted numerous regulations affecting HAP contracts. 24 C.F.R. §§ 880.101 through 880.613. 24 C.F.R. section 880.501(d)(1) provides that the amount of the housing assistance payment made to the owner of the unit is the difference between the contract rent for the unit and the tenant rent payable by the eligible family. For a vacant unit, the regulation provides that the owner will receive eighty percent of the contract rent for the the first sixty days of the vacancy. § 880.501(d)(2). Any excess over the contract rent collected by the owner from any source must be repaid as HUD directs. *Id.* For any vacancy exceeding sixty days, the housing assistance payment for the vacant unit is that amount "equal to the principal and interest payments required to amortize that portion of the debt attributable to the vacant unit for up to 12 additional months." § 880.501(d)(3).

Under 24 C.F.R. section 880.609(a), "contract rents" will be adjusted on the anniversary date of the contract upon the owner's request of the contract administrator. In addition, if not adequately compensated for by the annual adjustments, special adjustments may be granted to the extent HUD determines necessary to reflect increases in actual and necessary expenses of owning and maintaining the units as a result of substantial general increases in real property taxes, assessments, utility rates, and utilities not covered by regulated rates. § 880.609(b). Contract rent adjustments may not result in material differences between rents charged for assisted units and those for comparable unassisted units beyond differences that existed when the contract was executed. § 880.609(c).

24 C.F.R. section 880.205 sets the limitations on the distribution of project funds to the owner. The maximum distribution for a project for elderly families is six percent of the owner's equity in the project. § 880.-205(b)(1). The maximum for all other projects is ten percent. § 880.205(b)(2).

In 1983, each taxpayer entered into a HAP contract with HUD and its contract administrator, the City of Phoenix, for its respective project. The provisions of each contract were consistent with 42 U.S.C. section 1437f and the HUD regulations. Both projects were managed by Biltmore Properties, Inc. The Biltmore Properties' comptroller testified that between 1984 and 1990, approximately eighty-three percent of Myrtle Manor's income and eighty-seven percent of Morningside Villa's income came from HUD.

Nancy Bills, an employee of Biltmore Properties, testified that some of the residents may qualify to contribute nothing toward the rent, and may thus have a "negative rent" from allowances to which they are entitled. In those cases, HUD pays the entire contract rent on the unit and gives the tenant a check for an additional sum.

Bills further testified that if Biltmore had paid Phoenix privilege taxes on the taxpayers' housing assistance payments as they became due, those taxes would have been "taken into consideration." She stated that the four-year assessment of privilege taxes Biltmore Properties paid on the taxpayers' behalf came out of the operating account, which is usually applied to mortgages, insurance, taxes, operating expenses, and maintenance expenses. She testified that Biltmore Properties has no way to recoup this amount other than through the rent increase process.

Bills also testified that owners receive an annual percentage increase in contract rates based on the particular area in which the projects are situated; here, the Phoenix Standard Metropolitan Statistical Area. This annual adjustment factor is not directly connected to a project's actual expenses, damages or utility increases.

An administrative aide with the City's Neighborhood Improvement and Housing Department testified that neither taxpayer had inquired how they might recoup the sales taxes they paid under protest in this litigation.

Nancy Bills testified that Biltmore Properties employed resident managers for each of the taxpayers' projects. Resident managers, usually a couple, maintain the property, collect the rent, do the necessary paperwork, and keep the peace. They are on call twenty-four hours a day. The owners' policy requires managers to live on site in an employee apartment. When the resident managers' employment is terminated, they must vacate the apartment. The employment agreement for the resident managers of Morningside Villa, who were hired on July 10, 1984, provided in part:

2. Your gross cash wages are $500.00 per month, payable semi-monthly. In addition, you are permitted to occupy employee apartment No. 18, *the rental value of which is $629.00 per month (the "Rental Allowance")*.

(Emphasis added.) The employment agreement for the resident managers of Myrtle Manor contained a similar provision.

On May 31, 1988, the City of Phoenix tax audit division informed Biltmore Properties that it had audited the taxpayers' accounts for the period from December 1983 through February 1988. The City assessed additional privilege taxes of $10,736.38 against Morningside Villa and $8,605.96 against Myrtle Manor. A portion of each assessment represented additional taxes computed on the taxpayers' HUD housing assistance payments over the audit period. Another portion represented additional taxes on the rental value of the apartments in which the taxpayers required the resident managers to live. Before a City hearing officer, each taxpayer challenged the inclusion of the HAP portion of the total rent payment and the value of the resident managers' apartments within their gross income subject to privilege license taxation. The hearing officer rejected the taxpayers' arguments concerning housing assistance payments but agreed that the value of resident managers' apartments should not be included in their taxable gross income.

Pursuant to City Code section 14–575, the taxpayers filed separate actions in the Ari-

zona Tax Court. In each, the City asserted a counterclaim for additional taxes computed on the estimated rental value of the resident managers' apartments. The tax court consolidated the separate actions.

The taxpayers each moved for summary judgment. After briefing and argument, the tax court ruled in pertinent part:

The Court holds that the definition of gross income in the City Code, whether the old or the new, does not include the value of the resident manager's apartment. In making this ruling, the Court is assuming certain facts not reflected in the record. The Court assumes that the manager is required by his job to reside on premises, and the apartment is only available to the manager during the term of the manager's employment by the landlord. In such a case, the Court holds that the services of the manager are not measured by the value of the manager's apartment, and the apartment is not being rented to the manager. The Court rejects the City's argument that there is a reduction of or forgiveness of indebtedness in the arrangement described.

The Court also does not agree with the City of Phoenix that the arrangement between the manager and the landlord is a barter transaction. While it may be true that an individual might be willing to accept less compensation as apartment manager if he or she is given an apartment to live in rent free, if the landlord needs the manager to reside on the premises then the apartment cannot be construed to be a rental unit and whatever incidental or indirect benefits the Taxpayers obtain as a result of the arrangement is not part of the Taxpayers' gross income from the business of renting residence units.

If the factual assumptions which the Court has made are not correct, then the City of Phoenix may present such evidence at trial, and the Court will reconsider its holding herein.

. . . .

The Court further holds that the federal assistance payments are also within the definition of gross income as defined by both old and new City codes. The Court,

therefore, rejects the Taxpayers' argument that such payments are, by the language of the applicable ordinances, not to be included.

The Taxpayers' argument is that such payments are not rent. The tax, however, does not tax rent, it taxes gross income from the business of renting. These payments clearly fall within that definition.

. . . .

The Court does not find persuasive the Taxpayers' arguments on the preemption issue. . . .

The federal preemption and manager apartment issues were tried to the tax court on April 1, 1991. The tax court affirmed its earlier decision holding that the rental value of the managers' apartments was not taxable and held that the federal preemption doctrine does not prevent a taxing authority from imposing a transaction privilege tax on revenues received by a landlord from the federal government. The taxpayers appealed and the city cross-appealed.

## DISCUSSION

*HUD Housing Assistance Payments as Gross Income*

■ Before April 1, 1987, Phoenix City Code section 14–2 provided in part:

There is hereby levied upon persons on account of their business activities within the City ... privilege taxes ... to be measured by the gross income of persons ... in accordance with the following schedule:

(a) The tax rate for all activities hereunder ... shall be at an amount equal to 1.2 percent of the gross income from the business activity upon every person engaged or continuing in the following business activity:

. . . .

(9) Leasing, renting or licensing for a consideration the use or occupancy of real property located within the City, including any improvements, rights or interest in such property. This tax shall be levied on and collected from the person leasing or renting or licensing the

property to the tenant in actual possession. If the person so leasing or renting or licensing the tenant in possession is not engaged in the business of leasing or renting real property, or otherwise is exempt from the tax, the tax is levied on and shall be collected from the lessor nearest such person in any chain of subleases on the property who is engaged in the business of leasing or renting real property.

City Code section 14–1 defined "business" as "[a]ll activities or acts, personal or corporate, engaged in and caused to be engaged in with the object of gain, benefit or advantage, either direct or indirect, but not casual activities or sales as herein defined." Section 14–1 defined "gross income" as:

> The gross consideration realized by a taxpayer in the conduct of any activity subject to tax under Section 14–2 and not expressly exempt or excluded. "Gross income" includes (a) the value proceeding or accruing from the sale of tangible personal property, or service, or both; (b) the total amount of the sale, lease, license or rental price; (c) all receipts, cash, credits, reduction of or forgiveness of indebtedness, and property of every kind or nature derived from a sale, lease, license or other taxable activity; and (d) all said receipts whether payment is advanced prior to, contemporaneous with or deferred in whole or in part subsequent to the activity or transaction....

Effective April 1, 1987, the City of Phoenix adopted a version of the Model City Tax Code. New Phoenix City Code section 14–100 adopted the definition of "business" contained in former section 14–1 and new section 14–200 adopted the former definition of "gross income" contained in former section 14–1 almost verbatim. New § 14–200(a)(1) through (4), (c).

New section 14–445 recast the rental tax provisions without materially changing them as follows:

> (a) The tax rate shall be at an amount equal to one and two-tenths percent (1.2%) of the gross income from the business activity upon every person engaging or continuing in the business of leasing, li-

censing for use, or renting real property located within the City for a consideration, to the tenant in actual possession, including any improvements, rights, or interest in such property; provided further that:

> (1) Payments made by the lessee to, or on behalf of, the lessor for property taxes, repairs, or improvements are considered to be part of the taxable gross income....

The taxpayers contend that, under either version of the Phoenix City Code, the housing assistance payments they received from HUD were not taxable to them as gross income from the business of renting real property for a consideration. They reason that the payments are neither rent nor income derived from rental or leasing activity but are direct contractual payments by the federal government to the taxpayers. They contend that the consideration for those payments is the taxpayers' maintenance of their dwelling units in a decent, safe and sanitary condition in conformance with HUD's precise standards and that additional consideration for the contractual payments is the taxpayers' reservation of all their housing units exclusively for low-income families and the elderly. The taxpayers rely on *East Lake Management & Dev. Corp. v. Irvin*, 195 Ill. App.3d 196, 141 Ill.Dec. 279, 551 N.E.2d 272 (1990), and *National Corp. for Hous. Partnerships v. Chapman*, 18 Ohio App.3d 104, 481 N.E.2d 654 (1984), for the proposition that federal housing assistance payments do not constitute rental income.

The taxpayers incorrectly assert that the assistance payments are not tied to project owners' particular tenants. The applicable federal statutes, regulations, and the HAP contracts make it clear that project owners receive monthly payments calculated as the aggregate difference between the monthly per-unit rates specified in the contract, as adjusted, and the amount each particular tenant is charged individually according to income level. In substance, these are partial payments of contractually agreed rent on behalf of low-income tenants. *Cf. Holbrook v. Pitt*, 643 F.2d 1261 (7th Cir.1981) (tenants of federally subsidized housing project had

enforceable rights as intended third-party beneficiaries of HAP contracts).

The taxpayers' reliance on out-of-state authorities for the proposition that federal housing assistance payments are not "rent" is misplaced. *Chapman* merely held that a public housing tenant could be evicted for failing to pay her portion of the rent even though the landlord had received partial payment in the form of federal housing assistance payments. The court stated:

> The rent subsidy, while providing a personal benefit to a qualified tenant, such as Chapman, is not personal in the sense that it is her money. The fact that Spring Hill continued to receive the rent from HUD for Chapman's account does not entitle Chapman to avoid her contractual obligations.

481 N.E.2d at 656. Similarly, in *Irvin*, the question was whether a landlord's accepting federal housing assistance payments constituted acceptance of rent and waiver of the right to terminate the lease for noncompliance. The court held it did not. 141 Ill.Dec. at 283, 551 N.E.2d at 276. Both cases held that federal housing subsidy payments constituted something distinct from a partial payment of rent made on behalf of a low-income tenant.

However, the distinction made in those cases is not relevant in this case. Gross income is clearly defined in section 14–200(a)(3) of the Phoenix City Code as "all receipts ... derived from a ... lease, ... rental, or other taxable activity." The HAP contribution is a portion of the gross income from the lease or rental of real property. It is this component of the definition that sweeps HAP payments into the taxpayers' gross income. The HAP payments constitute a part of their "gross income" "from the business activity" of renting real property. *See* former City Code §§ 14–1, 14–2; current City Code §§ 14–200(a)(3), 14–445(a).

Accordingly, the tax court did not err in holding that the federal housing assistance payments received by the taxpayers during the audit period were subject to Phoenix privilege taxation.

### *Federal Preemption of Privilege Tax on Housing Assistance Payments*

■ The taxpayers observe that federal statutes and regulations governing subsidized low-income housing cover financing, design, construction, operation and day-to-day management, maintenance, record-keeping, rent subsidization, lease terms, tenant grievance procedures, notice requirements for rent changes, personnel policies, and compensation of employees. They urge that the field of renting housing to low-income persons under HAP contracts with HUD is completely occupied by federal law. Citing *Warren Trading Post Co. v. Arizona Tax Comm'n,* 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965), as followed in *Department of Revenue v. Moki Mac River Expeditions, Inc.,* 160 Ariz. 369, 773 P.2d 474 (App. 1989), *cert. denied,* 493 U.S. 964, 110 S.Ct. 405, 107 L.Ed.2d 371 (1989), the taxpayers argue that federally subsidized low-income housing is so tightly regulated that no room exists for taxation or regulation by the states. They further assert that, because the federal funds are intended to be used for mortgages, insurance, heating, cooling, water, power, repair and upkeep of the project premises, there is not enough money left to pay for all of the tenants' necessities if the City takes those funds by taxation. The taxpayers argue that the Phoenix privilege tax conflicts with the federal purpose to provide decent, safe, sanitary housing for low-income tenants, and is therefore invalid.

The taxpayers' analysis squares neither with the applicable case law nor with the record. In *Wardair Canada, Inc. v. Florida Dep't of Revenue,* 477 U.S. 1, 106 S.Ct. 2369, 91 L.Ed.2d 1 (1986), the Supreme Court stated:

> [S]tate law is not preempted whenever there is any federal regulation of an activity or industry or area of law. The Supremacy Clause, among other things, confirms that when Congress legislates within the scope of its constitutionally granted powers, that legislation may displace state law, and this Court has through the years employed various verbal formulations in identifying numerous varieties of pre-emption. See, *e.g., Louisiana Public Service*

*Comm'n v. FCC,* 476 U.S. 355, 368–369 [106 S.Ct. 1890, 1898–1899, 90 L.Ed.2d 369] (1986). But we have consistently emphasized that *the first and fundamental inquiry in any pre-emption analysis is whether Congress intended to displace state law, and where a congressional statute does not expressly declare that state law is to be pre-empted, and where there is no actual conflict between what federal law and state law prescribe, we have required that there be evidence of a congressional intent to pre-empt the specific field covered by the state law. Pacific Gas & Electric Co. v. State Energy Resources Conservation and Development Comm'n,* 461 U.S. 190 [103 S.Ct. 1713, 75 L.Ed.2d 752] (1983); *Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238 [104 S.Ct. 615, 78 L.Ed.2d 443] (1984).

477 U.S. at 6, 106 S.Ct. at 2372 (emphasis added). *Accord Louisiana Pub. Serv. Comm'n v. FCC,* 476 U.S. 355, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986); *Hillsborough County v. Automated Medical Labs., Inc.,* 471 U.S. 707, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985); *Maryland v. Louisiana,* 451 U.S. 725, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981); *Chicago & North Western Transp. Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981).

Nothing in 42 U.S.C. sections 1437 through 1437w expressly declares that state or local transaction privilege (excise) taxes on amounts received by project owners, either from low-income tenants or from HUD, are preempted.

Further, contrary to the taxpayers' contention, no true conflict exists between the provisions of 42 U.S.C. sections 1437 through 1437w and the Phoenix privilege tax on the business of leasing or renting real property. The taxpayers make no serious attempt to substantiate their claim that it would have been "physically impossible" for them to comply both with federal law and the Phoenix privilege tax. *See Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217–18, 10 L.Ed.2d 248 (1963). Indeed, the testimony of Nancy Bills indicated that the taxpayers could have absorbed the assessed taxes if they had paid them periodically when due.

The record similarly fails to support the taxpayers' repeated assertion that taxation of their HUD subsidy payments posed a significant obstacle to accomplishing the purposes underlying federal low-income housing subsidies because they received insufficient revenues to cover both Phoenix privilege taxes and tenant necessities. The testimony on which they rely, from Nancy Bills, was as follows:

Q. ... In the case of this particular tax paid under protest where you're talking eight or nine years or six or seven years worth of taxes because the audit has gone way back, that loss is exacerbated because it's five or six times a particular year, correct?

A. Yes.

Q. And, also, it included interest and penalties. So the project is completely foreclosed from ever recouping that because it's not a current tax item, for example, in a future year?

A. That's correct.

Q. Well, where did the money come from to pay the taxes?

. . . .

A. From the federal government.

Q. And did the federal government give the project a special dispensation and say: we're going to give you some additional money to pay this tax, or did you have to take it from the funds that were already coming from the federal government under the voucher system to pay for the housing?

A. We had to take it from the existing funds.

Q. Did that short the project on funds for the year in which that payment was made, the funds that were available to do what you do with the project?

A. Because it came directly out of the operating account, yes.

Q. And to what factors are the funds in the operating account applied? Mortgages and what else?

A. Mortgage, insurance, taxes, operating expenses, which is various types of utilities, and maintenance expenses, which in-

cludes salaries and the breakdown of the day-to-day expenses that any project of that type might have.

Q. Are those operating funds applied for such things as the payment of the heating and utilities, the water, the exterminating, the repairs, a broken window, whatever, where someone lives?

A. Yes, uh huh.

Q. What does the project do? It's now short of funds when it pays these extraordinary amounts. What does the project do to replace the services that it doesn't have the money to pay for?

A. We either have to go without, find a way to deal with the situation, or approach the owner for an advance to the project to cover an item like this.

Q. Is there any kind of truism in the area of subsidized housing about whether you get monies out of owners?

A. Generally because the limitation on the amount of distribution that can be made, it's just kind of an unwritten rule that, in addition to that limitation, you don't ask an owner for additional operating dollars. Most of the time they put in significant cash up front.

This testimony only establishes that paying the multi-year Phoenix privilege tax assessment may have forced the taxpayers either to find a way to deal with the situation, to withhold certain tenant services, or to approach a reluctant owner for an advance. Contrary to the implication the taxpayers seek to raise, nothing they presented in the tax court tended to show that even these moderately inconvenient temporary consequences would have occurred had the taxpayers periodically paid the taxes in question when due rather than in a single lump sum for a period exceeding four years. The taxpayers fall short of establishing that the City's personal property rental privilege tax by itself posed any genuine obstacle to accomplishing the purposes of 42 U.S.C. section 1437 *et seq.*

Given the lack of any express declaration of preemption or actual conflict between federal and local law, the taxpayers may prevail on their preemption claim only if there is evidence of a congressional intent to preempt the specific field covered by the Phoenix rental privilege tax. *See Wardair Canada,* 477 U.S. at 6, 106 S.Ct. at 2372. All the available evidence, however, is to the contrary. As we have stated, Congress expressly excepted HAP contracts from a general provision requiring that low-income projects be exempt from state and local real and personal property taxes. *See* 42 U.S.C. § 1437f(h). Additionally, 42 U.S.C. section 1437f(c)(2)(B) requires that HAP contracts permit the HUD secretary to adjust maximum monthly rents as "necessary to reflect increases in the actual and necessary expenses of owning and maintaining the units which have resulted from substantial general increases in real property taxes, utility rates, *or similar costs which are not adequately compensated for by the adjustment in the maximum monthly rent authorized by subparagraph (A)."* (Emphasis added.) This would appear to permit an owner to request an adjustment of maximum monthly rent to cover local privilege taxes on the business of renting real property. *See also* 24 C.F.R. § 880.609. The taxpayers fail to make a case for preemption under any of the applicable legal standards.

Decisions from other jurisdictions have reached the same conclusion on analogous facts. In *U.S. Constructors & Consultants, Inc. v. Cuyahoga Metro. Hous. Auth.,* 35 Ohio App.2d 159, 300 N.E.2d 452 (1973), the court stated:

Congress did not enact legislation exercising exclusive jurisdiction in regard to housing. The federal legislation merely sets forth a national housing policy, to promote the general welfare of the nation by employing its funds and credit to assist the states and their political subdivisions in eliminating unsafe and unsanitary housing conditions and the acute shortage of decent, safe and sanitary dwellings for families of low-income in urban areas. 42 U.S.C.A., § 1401. The legislation permits the federal government to offer and provide financial assistance, in the form of grants and/or loans to state or local housing agencies to develop low-rent housing. 42 U.S.C.A., §§ 1409 and 1411. It is clear from reading 42 U.S.C.A., §§ 1401 to 1436

that Congress did not intend to limit or exclude state action or to exercise supremacy in this area.

300 N.E.2d at 456–57.

Similarly, in *Northgate Constr. Co., Inc. v. State Tax Comm'n*, 377 Mass. 205, 385 N.E.2d 967, 968–69 (1979), the court held that federal statutes and regulations on building low-income housing projects did not invalidate state sales and use taxes on materials used in constructing the HUD-financed projects. Rejecting the taxpayer's contention that the state taxes should be deemed preempted because they would increase the cost of low-income projects, the court found that no federal statute, regulation or contractual provision between HUD and the local housing authority barred their imposition.[1]

■■■ Here, the taxpayers' contention that federal law leaves "no room" for application of the City's privilege tax to HAP subsidy payments reveals itself as legally vacuous. The "no room" formulation derives from *Warren Trading Post*, 380 U.S. at 690, 85 S.Ct. at 1245, which concerned a state tax applied to activities conducted by non-Indians on an Indian reservation. A distinct branch of federal preemption analysis has evolved for such cases. Preemption standards from other areas of the law do not apply. *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 145, 100 S.Ct. 2578, 2584, 65 L.Ed.2d 665 (1980). The Supreme Court has instead applied "a flexible preemption analysis sensitive to the particular facts and legislation involved. Each case 'requires a particularized examination of the relevant state, federal and tribal interests.' *Ramah Navajo School Bd., Inc. v. Bureau of Revenue of New Mexico*, 458 U.S. 832, 838 [102 S.Ct. 3394, 3398, 73 L.Ed.2d 1174] (1982)." *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 176, 109 S.Ct. 1698, 1707, 104 L.Ed.2d 209 (1989). In this case, Indian law federal preemption principles, like the "no room" test the taxpayers urge, must yield to the general preemption standards we have discussed above.

The tax court correctly held that federal law does not preempt local transaction privilege taxes on revenue that low-income housing project owners receive from the United States government.

*Taxability of Value of Management Services Received in Partial Exchange for Use of On-Site Managers' Apartments*

■■■ On cross-appeal, the City argues the tax court erred in holding that the taxpayers' on-site managers' apartments are not "rented" to them and that their services are not measured by the apartments' value. The City points out that a typical resident manager's employment agreement sets a particular sum as gross monthly cash wages and, in addition, permits the manager to occupy an apartment with a specified monthly rental value. The City reasons that "gross income" may be property of any kind, and that the specified rental value of the managers' apartments represents a "non-cash payment in the form an apartment." The City contends that as long as this item of "gross income" is derived from the business of renting real property, it is subject to Phoenix privilege taxation. The City urges that the rental value of the apartments the managers live in constitutes a portion of the consideration paid for managerial services. The City maintains that if on-site managers actually paid the taxpayers the stipulated rental value of their apartments, those payments would clearly constitute gross income from the business of renting real property even if the taxpayers reimbursed the resident managers those same amounts through their monthly wages.

The taxpayers respond that the City incorrectly assumes that the managers' apartments would be rented at fair market value if not assigned to the managers rent-free as a condition of their employment. The taxpayers assert:

blocked collection of sales tax on building materials incorporated into PHA-constructed projects where state sales tax burden was on "consumer" and building contractor was viewed as conduit of building materials to ultimate consumer).

---

1. *But cf. Housing Auth. of City of Seattle v. State of Washington, Dep't of Revenue*, 629 F.2d 1307 (9th Cir.1980) (*dictum*) (federal exemption of public housing authority (PHA) from local real and personal property taxation potentially

This could never occur because the taxpayers are *required by their HAP contracts to provide an apartment for their on-site manager at all times.* The managers' apartments are therefore a part of the taxpayers' business premises, not one of the units available to the public. Accordingly, due to the employer-employee relationship and *the contract requirement that the managers live on the premises,* any "imputed income" to the taxpayers results from the employer relationship and not the leasing of the apartments.

The services of the manager are not measured by the value of the managers' apartments, and it is uncontested that the apartments are not being rented to the manager. Therefore, the apartments cannot be construed to be a rental unit, and whatever incidental or indirect benefits the taxpayers obtain as a result of the arrangement is not part of its gross income from the business of renting or leasing real property.

(Emphasis added.) In reply, the City denies that the HAP contracts require the taxpayers to provide apartments for on-site managers. The City also argues it is immaterial whether the apartments would otherwise have been rented to persons other than the on-site managers.

The City's position is the better reasoned. The taxpayers cite nothing in their HAP contracts in support of their assertion that HUD requires them to provide on-site manager apartments. Our review of the HAP contracts, and the remainder of the record, reveals no such provision. We further observe that the taxpayers' witness Nancy Bills testified that requiring managers to live on-site in employee apartments was the owner's policy. That, however, is not the principal defect in the taxpayers' analysis.

There is no dispute that at all material times the Phoenix City Code levied privilege taxes on all gross income from the business activity of "leasing, renting or licensing for a consideration the use or occupancy of real property located within the City...." Former City Code § 14–2(a)(9); current City Code § 14–445(a). The code defines gross income as including "the total amount of the sale, lease, license or rental price ..." and "all receipts, cash, credit, reduction of or forgiveness of indebtedness, and property of every kind or nature derived from a sale, lease, license or other taxable activity...." Former City Code § 14–1; current City Code § 14–200(a). As of April 1, 1987, the code expressly included as "gross income" "barter, exchange, trade-outs, or similar transactions ... at the fair market value of the service rendered or property transferred, whichever is higher, as they represent consideration given for consideration received." Current City Code § 14–200(b). Both versions of the code define "business" as including "all activities or acts ... engaged in ... with the object of gain, benefit or advantage, either direct or indirect, but not casual activities or sales." Former City Code § 14–1; current City Code § 14–100.

In this case, the taxpayers obtained a direct benefit in the form of on-site management services in exchange for allowing their managers to use apartment units. Consistent with this view, the taxpayers' own witness testified that the taxpayers followed a policy of requiring this as a condition of their managers' employment. Thus, exchanging management services for apartment space was an integral component of the taxpayers' "business" of renting real property for a consideration. The services the taxpayers received from their resident managers can be characterized as "receipts" representing the "rental price" of each apartment unit. The value of the management services exchanged in the form of apartment rent constitutes income from the real property rental business. This element of the taxpayers' gross income is subject to Phoenix privilege taxation to the same extent as the rents their tenants pay them and the amounts they receive from HUD on the tenants' behalf.

The tax court based its contrary view on the proposition that the taxpayers' managers are *required to reside on the premises* and the apartments are available to them only during their employment. This does not affect our analysis.

The judgment is affirmed to the extent it holds (1) the City's privilege tax on the real property rental business is applicable to fed-

eral low-income subsidy payments received by the taxpayers from HUD and (2) such application is not federally preempted. The judgment is reversed to the extent it holds that the agreed value of the on-site managers' services was not taxable as gross income from the taxpayers' real property rental business. The matter is remanded for further proceedings consistent with this opinion.

Affirmed in part; reversed in part; remanded.

WEISBERG, P.J., and CLABORNE, J., concur.